A program offered by RPC Employer Services, Inc.

**EmployShare** ℠

EmployShare

*The ultimate solution for managing tomorrow's human resource needs.*

Saturday, October 28, 2000

Matt Swezey
StaffMarket Services
7316 Manatee Ave West #341
Bradenton, FL 342.9
E-mail: Matt@staffmarket.com

RE: RFP #25, NATIONAL INDOOR FOOTBALL LEAGUE, INC.

Dear Matt:

Thank you for this opportunity to respond to RFP #25, National Indoor Football League, Inc. Following is our proposal based on the information you supplied through your web site and via fax and phone. Please keep in mind that this proposal is valid until January 1, 2001. If service, in part or in whole, is not commenced by that time, then a new proposal may be necessary.

Proposal Notes

Dear National Indoor Football League, Inc. Management:

We provide employer support services that help our clients to focus on the business of their business, both in time, money, and efficiency. We call this program *EmployShare*™. As a professional employer, there are key areas that we may or may not influence, depending on your needs and requirements. Please keep in mind that every company has its unique needs and objectives. We are interested in meeting each particular need and objective <u>and will modify our service plan</u> to meet our client's specific needs.

## ❑ THE BUSINESS OF
## PROFESSIONAL EMPLOYER ORGANIZATIONS (PEOs)

There are specialists for nearly every type of function: trial lawyer, divorce lawyer, orthodontist, transmission specialist, aeronautic engineer, tax specialist, etc. You name it and there is likely a field of expertise to call on except being an employer. It used to be that your accountant or attorney could handle everything for you, from tax filings to personnel handbooks to workers' compensation claims hearings. But that has changed because each profession has become much more specialized. You now need to have four attorneys on hand to battle potential litigation and multiple accountants to manage taxes, abatements, payroll, health care, sales tax, and more.



NAPEO Member
National Association
of Professional Employer
Organizations

EmployShare by RPC Employer Services, Inc.
PO Box 350, Beaver Falls, PA 15010  800-635-9961 E-fax: 419-821-0229
WWW.EMPLOYSHARE.COM

EXHIBIT
A

tabbies



A program offered by RPC Employer Services, Inc.

**EmployShare**℠

*The ultimate solution for managing tomorrow's human resource needs.*

Professional employers specialize in *being* an employer. We utilize the economies of scale to provide services in the most cost-effective fashion possible. Payroll, payroll taxes, deductions, health care, credit union, workers' compensation, unemployment insurance, and personnel policy management are just a few of the areas we specialize in.

Our business (and industry) has flourished because we utilize our strength in numbers to provide your company with the human resource support that is necessary in order to protect your company from unwarranted government compliance implications and penalties. Following is a summary of our services that will be provided:

## ❑ WE BECOME YOUR 'VIRTUAL' PAYROLL DEPARTMENT

We are confident that you will greatly appreciate the payroll and personnel support that we give you as your virtual payroll department. You will have complete payroll wage input control via fax or Internet e-mail to our offices, but you will be able to stop at that point and walk away from the rest of your payroll and payroll tax responsibilities. This means that you will be free to focus on more profitable, profit-earning functions: receivable collections, client service, and overall increased productivity. Each of our clients has reported in different ways how they have found better, more profitable job functions for those employees that were once boggled down with administrative and payroll functions.

Employees will be receiving their earnings each Friday via direct deposit or payroll check. All data is processed by RPC, in Beaver Falls, PA, utilizing the latest in computer hardware (Dell) and software (Darwin). Our integrated HR and payroll software system provides us the support necessary to process accurate, timely checks and reports. And we make changes quickly, which is very important to our clients. They depend on us to have immediate answers.

### Here's how the payroll system works:

We recommend that your staff utilize our front-end payroll input software, which we will install and train your staff on. This simple program is very easy to learn/use and will allow for a more accurate and organized transfer of wage information compared to using standard fax time sheet input.

After entering and saving input data, you will e-mail the pay date file to us on Monday or Tuesday and we will bill you for the entire payroll costs on Wednesday. You will receive your check(s) on Thursday for Friday pay date and we will receive our payment, direct debit, or wire transfer from you by

Proposal
Notes

EmployShare by RPC Employer Services, Inc.
PO Box 350, Beaver Falls, PA 15010  800-635-9961 E-fax: 419-821-0229
WWW.EMPLOYSHARE.COM



NAPEO Member
National Association
of Professional Employer
Organizations



A program offered by RPC Employer Services, Inc.

# EmployShare™

*The ultimate solution for managing tomorrow's human resource needs.*

Thursday. We will work with you each payroll week to make certain that the payroll is always accurate and all changes are made according to your needs.

**All payroll taxes** and payroll tax filings are the sole responsibility of RPC Employer Services, Inc. Federal, state, and local taxes are deposited each week and RPC is solely responsible for the accuracy and timeliness of payments and filings. We have been pleased with the accuracy of our processing which has enabled us to expand into other states without any tax implications. Please remember that our payroll is processed on OUR tax identification number and NOT on your number.

**Direct deposit** of an employee's net pay is a free option that we recommend to everyone. Payday should be just as productive a day as any other. Having your pay directly deposited saves time, worry, and anxiety. There really is no need to go to the bank when the Federal Reserve will place your pay in your own account. Employees on direct deposit receive the same pay stub as when receiving a check. It is easy to sign up for direct deposit (the application is in the employee's paperwork) and the process usually takes effect within two business weeks.

## ❑ **WE BECOME YOUR 'VIRTUAL' PERSONNEL DEPARTMENT**

You are our client; we are your vendor. We are interested in helping and supporting your organization as you see the need. Consequently, you retain day-to-day control of your associates. We become your virtual personnel department, available in person, by phone, fax, and the Internet.

We protect you from employee discipline conflicts by acting as your enforcer, your guide, and your counsel. Our clients depend daily on our team of human resource professionals because they have the client's best interests at the forefront of their objectives.

### Employee Handbook

We have a thorough and legally extensive employee handbook that will become the foundation of our mutual personnel policies. We will customize the policies within the handbook to conform to your unique needs. Our handbook covers all aspects of personnel policy that are essential for every type of company. It is authored by one of the nation's leading labor law firms, Littler-Mendelson, and is updated, as pertinent law changes become precedent.

**Proposal Notes**

EmployShare by RPC Employer Services, Inc.
PO Box 350, Beaver Falls, PA 15010  800-635-9961 E-fax: 419-821-0229
WWW.EMPLOYSHARE.COM



NAPEO Member
National Association
of Professional Employer
Organizations



A program offered by RPC Employer Services, Inc.

**EmployShare**

*The ultimate solution for managing tomorrow's human resource needs*

### Day-To-Day Personnel Communication

Policy violations and employee separations are critical points that must be documented accordingly. We have an easy-to-use ADVISORY FORM that can be faxed or e-mailed between our companies as a means of documenting an employee's personnel file. We utilize a staff of seasoned attorneys in matters of labor, unemployment, and workers' compensation and will use their services at no added charge to you. We want to protect our relationship with your employees and will put forth our best efforts to make sure that all personnel correspondence is handled in the most professional and confidential manner possible.

Our clients depend on our impartial implementation of policy, knowing that our sole objective is to protect them from needless litigation and conflict.

### ☐ WORKERS' COMPENSATION MANAGEMENT

Your group will becomes part of our Ohio workers' compensation pool, managed by our staff in conjunction with Professional Risk management, Youngstown, Ohio, one of the nation's leading workers' compensation management companies. Your workers' compensation premium is remitted each pay period and is calculated against actual reported wages. There are no premium deposits or final audits since you are part of our group

We are responsible for all claims, including accident reporting, accident investigation, and pending litigation. However, we expect your complete cooperation in all matters relating to our mutual employees.

All clients are expected to make available light-duty job assignments for early return-to-work situations. Light-duty assignments not only reduce your total cost, but also help to get the injured employee into the workplace sooner. We will guide you through light-duty options as the need arises.

### Workers' Compensation Premium Savings

RPC enjoys an extremely large credit on its Ohio workers' compensation policy. You will save at least $436,536 in workers' compensation premium by utilizing our service. The base rate for code 9179 is 26.1958% of taxable wages. RPC will charge 11.65% of taxable wages, which amounts to a savings of 56% off base rate. Ohio is a state-run workers' compensation insurance program and we have received approval from our pool managers to add your group. Ohio will cover your teams and support staff in Ohio based on the national headquarters for your league locating Ohio, preferably close at hand in Warren, Ohio.

Proposal Notes

EmployShare by RPC Employer Services, Inc.
PO Box 350, Beaver Falls, PA 15010  800-635-9961 E-fax: 419-821-0229
WWW.EMPLOYSHARE.COM



NAPEO Member
National Association
of Professional Employer
Organizations



A program offered by RPC Employer Services, Inc.

**EmployShare**

*The ultimate solution for managing tomorrow's human resource needs.*

## NORTH EAST OHIO, A FOOTBALL CAPITAL

Warren, Ohio, located 20 miles north of Youngstown, is equidistant from Cleveland (Browns) and Pittsburgh (Steelers). Football has always been the premier sport. Rent, taxes, and such are very low in Warren as compared to any other area.

Population is 479,155 with median household income of $33,479. Median home value is $67,928 and the business base includes General Motors and numerous large steel makers.

Local support for your organization will be tremendous, especially if you can build an arena here also. We have solid relationships within the community and with political leaders. We can help you grow and prosper while at the same time serving your payroll and personnel needs. Certainly a mutually beneficial business relationship.

## ❑ UNEMPLOYMENT INSURANCE MANAGEMENT

Since all employees are paid on our tax identification number, you are literally protected from tangles with unemployment claims. We will minimize unemployment claims abuse through careful implementation of our policy handbook along with our Advisory form. Every advisory communication from your managers will become part of the employee's personnel file. We will work closely with your managers to make sure that we abide by the law yet control unnecessary unemployment claims. Of course, you are free to apply your time to your business. We will apply our time to controlling hidden litigation that can easily arise out of an employment dispute.

## ❑ CREDIT UNION BENEFITS

We belong to numerous credit unions, so your employees will be welcomed to join the credit union of their choice. There are many valuable services available to all employees, from Visa cards to home and auto loans. The interest rates are exceptional and the service response is prompt. We hope that employees consider setting aside some money for the future and we want to make that process as simple and easy as possible. Any payroll deductions to credit unions are directly deposited into employee accounts, which makes the process quick and accurate.

Proposal Notes

EmployShare by RPC Employer Services, Inc.
PO Box 350, Beaver Falls, PA 15010  800-635-9961 E-fax: 419-821-0229
WWW.EMPLOYSHARE.COM



**NAPEO** Member
National Association
of Professional Employer
Organizations



## ❏ NATIONAL PPO HEALTH COVERAGE
We have an excellent medical benefits plan. Since medical benefits are not part of your Request For Proposal, we can discuss these matters at a later date and as you see the need.

## ❏ NATIONAL DENTAL COVERAGE
Dental coverage is available but is not being presented at this time per your request.

## ❏ VISION COVERAGE
Vision coverage is available but is not being presented at this time per your request.

## ❏ LIFE INSURANCE
Our medical plan includes $10,000 of term coverage for all employees. For two-party and family coverage, we include spouse coverage of $2,500 and dependent coverage of $1,000 per dependent.

## ❏ DISABILITY INCOME PROTECTION
Group disability income protection is available. Our plan is an integrated benefit that includes life, ltd, and std. Rates are exceptional and coverage is extended on a guarantee issue basis which means that there are no medical questions asked for standard coverage. Guarantee issue limits are:

| | |
|---|---|
| LIFE: | $190,000 |
| LTD: | $10,000 per month |
| STD: | $1,385 per week |

Your actual benefit and rate is based on the life amount, which is equal to annual earnings.

## ❏ SECTION 125 PRE-TAX DEDUCTION SERVICES
We have an IRS-approved Section 125 plan that allows all health insurance deductions to be withheld from paychecks on a pre-tax basis. All employee deductions are withheld from gross wages, which saves the employee and your company tremendous tax dollars. We pass these savings directly to your invoice and your employees take home more net pay.

## ❏ 401(k) RETIREMENT PLAN SERVICES
We have an excellent retirement program through our 401(k) plan administered by Great West, one of the Nation's leading plan administrators. Employees can set aside any amount of money each week, tax-deferred, through payroll deduction and take advantage of compound interest earnings immediately. We do not charge extra fees for using our

Proposal
Notes



EmployShare by RPC Employer Services, Inc.
PO Box 350, Beaver Falls, PA 15010  800-635-9961 E-fax: 419-821-0229
WWW.EMPLOYSHARE.COM



*A program offered by RPC Employer Services, Inc.*

## EmployShare™
*The ultimate solution for managing tomorrow's human resource needs.*

401(k) plan, so employees are free to join the plan at their discretion. Our plan allows bonus contributions to be made on behalf of employees. This means that you can elect to use our 401(k) as a vehicle for distributing profit sharing or other incentive payments.



**Proposal Notes**

### ❏ FINANCIAL SERVICES
All EmployShare associates are eligible to receive American Express Financial Services at preferred rates. Investment advice, pertaining to the 401(k), can be very useful for maximizing return on your employees' 401(k) earnings.

Management workshops and seminars are available at no added charge. Personal Financial services are made available to all EmployShare associates at preferred rates.

**Note:** American Express Financial Advisors is one of the largest EmployShare clients (associates). You may want to discuss our program with them to better understand why they chose EmployShare over all other employer service options.

### ❏ FINANCIAL DETAILS
See attached for all rate details.

### ❏ GETTING STARTED
Here is a snapshot of the implementation process, should you decide to proceed:
1. Review proposal and discuss all issues and questions.
2. Authorize Service Agreement; detailing relationship between parties, rates, terms, and effective start date.
3. Complete Employee enrollment files. We usually meet with each employee group to discuss all aspects of our program, answer questions about paperwork, and explain in detail all benefits, 401(k), insurance, etc.
4. Process employee enrollment information and other relevant forms.
5. Prepare invoice remittance process, whether by wire transfer or direct debit. Bank routing and account information is gathered and setup in advance. All payroll invoices are due and payable before release of paychecks.



NAPEO Member National Association of Professional Employee Organizations

EmployShare by RPC Employer Services, Inc.
PO Box 350, Beaver Falls, PA 15010  800-635-9961 E-fax: 419-821-0229
WWW.EMPLOYSHARE.COM



A program offered by RPC Employer Services, Inc.

## EmployShare

*The ultimate solution for managing tomorrow's human resource needs.*

6. Install front-end payroll input software at client site. Conduct training for client personnel dealing with payroll input software (one hour). Conduct input and e-mail tests using sample payroll files.
7. Create first input data file at RPC based and e-mail to client for first pay. RPC will create new payroll input files every pay period to insure that client has accurate account of all active employees.
8. Receive first payroll input file from client, process all data, and invoice customer by fax or e-mail.
9. Receive first invoice payment via wire transfer or direct debit.
10. Deliver paychecks (or direct deposits) to customer along with hard copy of invoice and invoice detail reports, department costing, and other required reports.

The EmployShare payroll and human resource system can produce nearly any report imaginable. We will determine beforehand the exact format of each report required and the frequency of each report.

We know that you and your employees will appreciate our package of services. Please call me at 800-635-9961 with your questions. I look forward to discussing your questions and hope that we can be of service as you see the need.

Thank you for this consideration.

Sincerely,

*Daniel J. D'Alio*

Daniel D'Alio
President & CEO

Proposal
Notes



EmployShare by RPC Employer Services, Inc.
PO Box 350, Beaver Falls, PA 15010  800-635-9961 E-fax: 419-821-0229
WWW.EMPLOYSHARE.COM

10

1    Q.      So other than Richard Caputo,

2    are there any other owners or

3    partners?

4    A.      No, sir.

5    Q.      So it's the two of you and

6    you're equal?

7    A.      Yes.

8    Q.      Okay.  And what is Richard's

9    title?

10   A.      Secretary/treasurer, I

11   believe.

12   Q.      Now, in your capacity as

13   president, what are your

14   responsibilities?

15   A.      Generally marketing and

16   operational oversight, client

17   relations and everything else normal

18   of a president of a company.

19   Q.      What type of actual entity is

20   RPC?

21   A.      RPC is a human resource

22   company with many acronyms or

23   descriptions.  We can be known as an

24   employee leasing company.  We can be

25   known as a professional employer

EXHIBIT

B

National Indoor Football League
Operations Manual
Team Participation Agreement
Date: 03/01
Page 1 of 7

## TEAM PARTICIPATION AGREEMENT

THIS AGREEMENT this _____/_____ day of _____MARCH_____,20 _01_ between

# National Indoor Football League, llc (NIFL)

And

_____LAKE CHARLES LAND SharKs_____ ("TEAM")

### WITNESSETH

WHEREAS Team desires to compete in the National Indoor Football League (the League) established by The NIFL and upon application made by the team, the NIFL is willing to allow Team to compete.

NOW, THEREFORE, The parties intending to be legally bound hereby agree as follows:

1. **LICENSE TO OPERATE**
   For valuable consideration, the receipt of which is hereby acknowledged, NIFL hereby grants To Team a revocable license to operate a professional football Team as a member of the League in _LAKE CHARLES, Louisiana_ _____, in accordance with the agreement.

2. **OPERATION OF PROFESSIONAL FOOTBALL TEAM**
   A. Team agrees to operate a football team to participate in scheduled games by the NIFL and abide by the Operating Regulations attached as Exhibit "A", the Operations Manual attached as Exhibit B, rules of the game and by-law, of the League as adopted by the League and as they may be amended from time to time.

   B. Team further agrees to provide a professional football team ready, willing and able to play the scheduled League games.

   C. Team recognizes that great expense and preparation is involved in hosting each and every professional football contest and agrees that irreparable harm will result to the League and other member teams of the League if Team fails to operate its professional football team in accordance with this agreement, the Leagues operating regulations, operations manual and rules as such may be amended from time to time. Team acknowledges it is subject to a claim for actual damages incurred by League or other member teams in the event team falls to operate its team in accordance with this agreement, the League's Operating Regulations, Operations Manual and rules as such may be amended from time to time.

3. **FINANCIAL ASSURANCES**
   Team shall annually post a letter of credit (from team's bank) in the amount of $25,000.00 as security. For the purpose set forth herein, team may deposit $ 25,000 in League special account in lieu of issuing a Letter of Credit. A majority vote of the team owners (the whole league) is necessary to invoke the letter of credit (LOC). If a team is in default, as defined in sec.

**EXHIBIT**

C

majority vote the LOC can be called upon.

Letters of Credit are due into the league office by March 15, 2001. Letters of credit should be issued from December to December 31 – renewable annually.

4.   **BOARD OF GOVERNORS**
A Team shall have one representative with (1) vote on the Board of Governors of the League. Teams seat on the Board of Governors shall be forfeited in the event Team is declared in "Default" with this agreement and the Financial Assurances Agreement (Letter of Credit)

5.   **PROPERTIES**
A.  Team agrees to select a team name, logo and colors, subject to approval by League and refrain from allowing the use of any unauthorized names, marks, logo designs, symbols or *colors*. Teams may not change or modify team name, logo or colors without the express written consent of NIFL. Team shall have ownership of the name " *LAND SHARKS* " and all related logos and trademarks. However, it is agreed that ownership of all of Team's trade names, logos and trademarks shall revert to the NIFL in the event that Team ceases operating a team in the League or otherwise defaults in its obligations to the NIFL under this agreement until the end of the current playing season (to enable team to continue to play during the season). Upon completion of the playing season, the properties will be returned to the Team ownership group.

B.  NIFL hereby grants to Team a non-exclusive license to utilize the trade name "National Indoor Football League" and all other trade names associated with the league.   Such license shall run concurrent with this Agreement.

6.   **LEAGUE DUES AND ASSIGNMENT OF INVENTORY TO THE NIFL**
Team shall pay NIFL a monthly dues payment to be fixed annually by the NIFL. The 2001 dues are set at $ 500.00 month, due at the beginning of each month.

1.  In the event that any payment is not made when due, Team shall pay a late payment fee of 10% of the amount of any payment that is past due.

B.  Team shall assign to NIFL for its exclusive use in trading for national sponsorships:
1.   2 dasher board signs
2.   1 field logo – plus two locations in building -the NIFL must be placed as a logo on the playing field (possibly the 10-15 yard line) League recognition is required on the field.
3.   4 P. A. announcements per game.
C.  Each team will have league logo prominently displayed in same spot (to be determined by league).

7.   **OFFICIALS PAY AND ASSESSMENT**
Team shall pay each member of its officials even the amount fixed by NIFL for each year from time to time. It is acknowledged and agreed that the amount is currently $125.00 per official per game. All teams must pay the officials the same fee. The officials must be college or professional Referees. Certified officials only. The Director of Officials of the league will make selection of referees.

National Indoor Football League
Operations Manual
Team Participation Agreement
Date: 03/01
Page 3 of 7

8.   **EXCLUSIVE TERRITORY**
     Team shall be the exclusive operator of a member professional team of the League within the
     metropolitan statistical area of Team's home venue. Team may not participate in games outside of
     the exclusive territory unless scheduled by the NIFL. Team may not change its home venue or
     attempt to move its exclusive territory without the prior written consent of NIFL, such consent
     will not be unreasonable withheld.

     Current member owners have first right of refusal on any expansion area at the current NIFL
     market value.

9.   **SALE OR TRANSFER OF LICENSE**
     Team shall have the right to sell or transfer its license to operate upon the prior written approval
     of the NIFL. Said approval shall not be unreasonably withheld.  League members must have the
     right to review new ownership to ensure that they are viable to continue the team.

10.  **DEFAULT**
     1.  Team may be in default of this agreement upon the occurrence of any of the following events
         and a majority vote of the members...

         A  In the event that Team fails to appear and participate in a game scheduled by NIFL or
            participates in any game not scheduled or approved of by the NIFL unless prevented by
            acts of God, nature or events beyond control.

         B.  In the event that Team transfers Team ownership without notice and review by the league
             members.

         C.  In the event that Team defaults under any player agreement or failure to make payment of
             player wages and other financial obligations which Team has to its players as set forth in
             Player agreements,

         D.  In the event that Team fails to procure policies of insurance required by state and arena.

         E.  In the event that Team defaults under arena lease

         F.  A team is not paying league dues, fines, or assessments to the league - with 30 days written
             notice the league may declare this agreement as null and void and may elect to seek the
             following remedies, or any remedy at law.

     2.  Team shall be given 15 days of written notice of pending default prior to being declared in
         default.

11.  **TERMINATION OF AGREEMENT**
     An event of default as defined in 10 of this agreement may be cause for termination of this
     agreement and Team's license to operate a professional football club as a member of the League
     In the event of termination of this agreement:

     A.   League shall notify Team of Termination of this agreement arid revocation of its license to

operate by certified mail at Teams last known business address.

B.  Team agrees to pay to League within fifteen (15) days after the effective date of termination such amounts owed to League which are then unpaid under this agreement, if any.

C.  League may have unrestricted right to demand payment against the issuer under the letter of credit to continue playing season.

D.  The NIFL may elect to operate the Team's professional football team to complete the current playing season. The league shall further have the full and unrestricted right to take and seize all trade names, trademarks, team logo, uniforms, equipment, merchandise contract and lease rights, and /or property, and Team agrees to surrender the aforementioned property to League for the duration of the playing season.  However, League shall have no obligation to exercise any of its rights under this provision nor will be liable for any debts of Team.  Properties will be returned to team ownership after completion of season.

E.  Upon termination, the NIFL shall have no further obligation to Team and Team forfeits any property right in it's license to operate and membership in the League, Team will not be permitted to transfer or sell it's license

F.  Team's seat on the Board of Governors may be automatically revoked, by electing to take steps to seek any remedy at law.

12.  **DEFAULT BY LEAGUE**
NIFL may be deemed to be in default of this agreement in the event that the League fails to have eight 8 operating teams league-wide (including The Team) by commencement of each calendar year. In such event the team shall be entitled to affiliate itself with such League, as the team deems appropriate.

13  **ATTORNEY FEES and COSTS**
The NIFL shall be entitled to recover from Team all attorney's fees, costs and disbursements incurred by the NIFL in connection with the interpretation or enforcement of this agreement when team is found in default by member owners. Team shall likewise be entitled to recover from NIFL league all attorney's fees, costs, and disbursements should league be found in error.

14  **U.S. DOLLARS**
All amounts to be paid hereunder shall be in United States Dollars unless stated otherwise herein.

15.  **LAWS AND VENUE**
This agreement shall be interpreted in accordance with the laws of the state of Ohio.  Should litigation be initiated in connection with the Interpretations or enforcement of this agreement. Whichever party seeks law then goes to recover attorney fees.

16.  **BINDING EFFECT**
This agreement shall be binding upon and shall ensure to the benefit of the parties hereto, their successors and assignees until December 31 of year and shall automatically remain in effect until written notice of cancellation is given within 30 days of December 31.

17. **ASSIGNMENT**
   Team shall not assign its right or responsibilities pursuant to this agreement to a third party without the prior knowledge and consent of the NIFL member teams. Member teams must have assurance that new ownership group has the funds to continue the current playing season.

18. **AUDIT**
   Team shall provide the NIFL with an annual accounting, of which, a profit and loss statement is acceptable.

19. **TERMS and RENEWAL**
   This agreement shall commence on the date of execution and expire on December 31, 2001. Agreement automatically renews unless team submits, by certified mail, a notice of withdrawal within 30 days of December 31.

21. **FACILITY LEASE**
   Team negotiates arena leases. League requires a copy of lease or a letter from arena guaranteeing the playing dates.

22. **FINES and SUSPENSIONS**
   League shall have the right to fine and suspend players, coaches and other personnel of team for violation of League rules and by-laws. Fines assessed to Team's personnel are to be collected by Team and shall be deemed assessments under this agreement and are payable by Team to the NIFL.

23. **INSURANCE**
   Team shall carry and keep at its expense. The minimum insurance required by the state and arena where team is playing. Team must name the NIFL "successors and/or assigns" as an additional insured on all of the above described coverage's. The League recognizes that these minimum insurance figures shall be subject to adjustment by the NIFL from -time to time in the discretion of the NIFL.

24. **NIFL REPRESENTATIONS**
   A. All participating teams of the League will execute a standard Team Participation Agreement, substantially similar to this agreement. And be bound by the similar terms and conditions as set forth in this agreement governing the operations of League owned Teams. Furthermore, this agreement shall not be altered, amended, changed, or modified except in writing executed by the majority of the partners.
   B. This agreement may be amended by majority vote of the members.

25. **LEAGUE DUTIES**
   NIFL will provide the following services on behalf of Team and other member teams

   A. Schedule games in a number to be fixed by the League, Team will have one week to review and ask for changes

   B. Provide qualified oversight of game officials;

National Indoor Football League
Operations Manual
Team Participation Agreement
Date: 03/01
Page 6 of 7

C. Coordinate league sponsorships, discounts and barter arrangements for the benefit of the member teams. Committees will be formed from (members from each district) to work league-wide sponsorships.

D. Provide a league-wide Commissioner

E. Enforce by-laws, rules and regulations

F. Compile and publish league statistics

G. Investigate and approve expansion applicants and issue expansion team licenses, of member teams will review these applications and report recommendations to the whole league. Licenses will be issued through the league office.

H. Annually publishes a League operations manual and distributes a copy of said manual to Team; final approved copy will be forwarded to each member team.

K. A professional employee organization will be utilized by the league to benefit all members of league. The PEO requires that the monies be deposited into a central account by Monday for checks in team's hands by Thursday of that week.

L. Review PEO yearly.

26.    **MARKETING SCHOOL FEES**
There will be a ____xxxxx_____ fee to enter the NIFL. This fee automatically includes all marketing materials. This is a league requirement.

27.    **CONSTRUCTION**

A. The exercise of any right by either party will not be considered to be an election of any remedy or the exclusive remedy of a party. Failure to exercise any right or remedy available to the NIFL under this agreement at any time shall not be considered to be a waiver or release of the right to exercise that right or remedy

B. All headings and titles of sections are for convenience only. The wording of each section shall govern over its heading. Words and phrases herein, including any acknowledgment hereof if any, shall be construed as the singular or plural and as masculine, feminine or neuter gender, according to text.

C. It any part of this agreement shall be adjudged invalid, the remainder shall not be invalid. Any part of any section found to be invalid shall not invalidate the remaining part of said section

D. It is agreed between the parties that time is of the essence in each provision of this agreement.

E. This agreement may be executed by the parties in separate parts with the signature of Each party to a copy of the contract, even if not the same copy constituting the creation of a binding contract between the parties.

National Indoor Football League
Operations Manual
Team Participation Agreement
Date: 03/01
Page 7 of 7

28.   **EXHIBITION AND PLAYOFF GAME PROCEEDS**
    A.  The Team shall be entitled to retain all of the net proceeds of any exhibition games that are played by Team. However, Team shall be responsible for and shall pay all direct costs and expenses incurred by the visiting team for such exhibition games, including, but not limited to, travel costs, the visiting team's housing costs and compensation to the visiting team's player's and coaches.

    B.  The net proceeds of all League Playoff games shall be divided as follows
        1.   15% to the League.
        2.   30% to the visiting team at such playoff game, and
        3.   55% to the home team at such playoff game.

    D.  Championship game will be determined by committee, but certainly the most beneficial site will be chosen.

29.   **FACSIMILE SIGNATURE**
    Facsimile signatures will be accepted as original signatures. However, for record keeping purposes, an original signed document must be submitted to the League within 30 days of facsimile transmission.

IN WITNESS WHEREOF, the parties have hereunto set their hands and seal the day and year first above written.

National Indoor Football League, inc

By: _____      By: _____
Bruce Bailey (Exe. Comm. Chairperson)   Its: _____

By: _____      By: _____
Carolyn Shiver (Exe. Comm. Chairperson)   Its: _____

By: _____
Duane Anderson (Exe. Comm. Chairperson)

# RPC Employer Services, Inc.
## Service Agreement

This Agreement is made and entered effective this 20th day of March, 2001, by and between RPC Employer Services, Inc. ("RPC"), an Ohio Corporation located at 7771 Raglan Dr. NE, PO Box 8605, Warren, Ohio 44484, and;

Company Name:     National Indoor Football League, L.L.C.
Address:          PO Box 8628
City:             Warren
State:            Ohio
Zip:              44484
EIN or SSN:       94-3387642 (Ohio Corporation)

## 1.   STAFFING

RPC hereby agrees to furnish to Client, and Client hereby agrees to engage from RPC, staffing for all Job Function Positions.

## 2.   TERM OF AGREEMENT

This Agreement shall commence on the EFFECTIVE STARTING DATE set forth below and shall continue in effect of the initial term ("Initial Term") of one (1) year following the commencement of this Agreement. This Agreement may thereafter be extended by mutual consent of both RPC and Client from month to month "Extended Term". During the Initial Term, RPC or Client may terminate this Agreement by giving written notice of termination to the other party thirty (30) days prior to the effective date of said termination. During the Extended Term, either party may terminate this Agreement upon giving written notice thirty (30) days prior to the effective date of said termination. Notwithstanding anything to the contrary contained in this Agreement, RPC may terminate this Agreement immediately upon twenty-four (24) hours notice to Client in the event of a material breach by Client of any of the provisions to this Agreement.

### 2a.   PAYROLL REPORTING: Commencing with the EFFECTIVE STARTING DATE, and according to the payroll processing frequency itemized on the FEE STRUCTURE STATEMENT page, the Client must report employee wages in a timely manner so as to allow RPC to process and distribute payroll and related benefits in accordance with Federal and State guidelines. Should client fail to report wages each and every pay period, RPC shall reserve the right to immediately terminate this agreement pending payment in full of all obligations. Client shall be solely responsible for all wages and applicable taxes pertaining to unreported wages. If Client requests to activate service with RPC in the future, then Client would be required to meet normal underwriting guidelines in order to initiate new service.

## 3.   FEES

a.   Client shall pay RPC a fee (the "Fee") as specified in the Fee Structure Statement attached hereto and made a part hereof. The Fee shall be paid in full, by wire transfer, direct bank debit, certified check or money order and delivered to RPC not less than twenty-four hours prior to the distribution of any payroll checks for such period. Any failure by Client to make payment as set forth shall render Client in default of this Agreement and constitute a material breach hereof, and any Employee(s) assigned to Client shall be transferred to Client effective the last day of the preceding pay period for such Employee(s).

b.   The Fee shall consist of the following items: all payroll (inclusive of bonuses, holiday pay, sick leave pay, vacation pay and/or other special payments), all applicable federal, state and local taxes, including all applicable Federal Insurance Contributions Act, Federal Unemployment Tax Act and Medicare Coverage payments, all premiums and contributions in connection with any employee retirement or other benefits including, but not limited to, all health, accident disability or other insurance premiums, all workers' compensation premiums including any required deposits not charged as part of the set-up fee, all unemployment compensation charges, and a service fee (the "Service Fee") for the administrative services of RPC.

EXHIBIT

tabbies

D

# RPC Employer Services, Inc.
## Service Agreement

c.    During the Initial Term of this Agreement, RPC may not adjust the Fee except for statutory increases in employment taxes or insurance or any change in the Job Function Positions required by Client. During the Extended Term of this Agreement, RPC may adjust the Fee for statutory increases in employment taxes or insurance or any change in the Job Function Positions required by Client, or upon thirty (30) days prior written notice.

d.    Any increase in the Fee for statutory increases in employment taxes or insurance or any change in the Job Function Positions shall be effective on the date of such increases or change.

e.    Client agrees to verify all time sheets or other evidence of time submissions by Employees (as defined in Paragraph 13.)

## 4.    CLIENT DEPOSIT

a.    RPC reserves the right at any time during the term of this Agreement to require Client to deposit such funds or provide such other guaranty as RPC in its sole discretion, may determine from time to time to guarantee the performance of Client hereunder. The deposit shall be in an amount equal to one (1) payroll cycle as calculated for each Client. The waiver by RPC of this requirement at any time shall not stop or act as a waiver of RPC's right to require a deposit at any subsequent time during the term of this Agreement.

b.    In the event Client fails to maintain the required deposit from time to time as determined at the sole discretion of RPC the same shall be termed to be a material breach of this Agreement.

c.    On termination of this Agreement, any balance remaining in the account of Client shall be remitted to Client on or before [sixty (60)] days after the termination of this Agreement, provided that Client has performed all of its obligations under the terms of this Agreement

d. Any moneys of Client in possession of RPC hereunder may be applied to RPC to any default in any payments by Client under the terms of this Agreement.

## 5.    INSURANCE

a.    Workers' Compensation Insurance

RPC shall furnish and keep in full force and effect at all times during the term of this Agreement workers' compensation insurance covering all Employees filling Job Function Positions under the terms of this Agreement, and where applicable, such policies shall designate Client and RPC respectively, as the first and second named insured. In addition, RPC shall cause that appropriate evidence of insurance be filed with the Worker's Compensation Bureau of any state as deemed necessary by the Client.

b.    Automobile Liability Insurance

If any Employee filling a Job Function Position is to drive a vehicle of any kind for Client, Client shall furnish automobile liability insurance covering said vehicle and said Employees. The policy of automobile insurance shall insure against public liability for bodily injury and property damage, with a minimum combined single limit of One Million Dollars ($1,000,000.00) and uninsured motorist or personal injury protection, or equivalent coverage, of at least the minimum limits required by the state where such "no fault" laws apply. Client shall cause its insurance carrier to name the Employees and RPC as additional named insured and loss payees, and to issue a Certificate of Insurance to RPC whereby RPC is provided not less than (30) days advance notice of cancellation or material change in any such automobile liability insurance coverage. RPC shall be the Certificate Holder for purposes of making claims thereunder.

c.    General Liability Coverage

Client agrees to cause its insurance carrier to name RPC and Client's employees as additional insured on Client's general liability insurance policy, and shall issue a Certificate of Insurance evidencing same to RPC whereby RPC is provided not less than thirty (30) days notice of cancellation or material change in said general liability insurance policy. The minimum requirements of said general liability insurance policy shall be One Million Dollars ($1,000,000.00) combined single limit including, but not limited to, where applicable, premises, operations, products, completed operations, contractors, personal injury, host liquor liability, independent contractors and full liquor liability. In the event, Client renders professional services, a professional services rider on said general liability and extended coverage policy shall be required as

# RPC Employer Services, Inc.
## Service Agreement

applicable. Said professional services liability coverage shall, depending on the business activities of Client, and upon the written request of RPC provide for minimum limits of coverage of One Million Dollars ($1,000,000.00).

   d.   Group Medical Insurance

After the completion of a specified probationary period, each Employee filling a Job Function Position may elect within the enrollment period at his or her cost, to be covered by a group medical insurance policy offered by RPC. Each Employee may elect additional coverage by reimbursing RPC the actual cost of the extra coverage. In the event an Employee is terminated or is otherwise unavailable to reimburse RPC for coverage elected, Client shall reimburse RPC for any premium dollars advanced by RPC on behalf of the Employee.

   e.   Retirement Plan Each employee filling a Job Function Position may voluntarily participate in a 401k Plan provided by RPC to the extent such plan is in existence.
   f.   Excluded Coverage

RPC shall not be responsible and shall not furnish insurance for claims involving discrimination or harassment, including but not limited to claims involving age, sex, race, religion, equal pay, national origin, disability, marital status, veteran status or sexual preference. Client agrees to indemnify and hold RPC harmless for any and all liability for such claims resulting from acts or omissions of Client or any director, officer, employee, or other agent of Client, as further described in Paragraph 9. Any damages, attorneys' fees or expenses awarded to an Employee or his/her representative as a result of any such claims will be paid by Client.

   g.   Subrogation

Client hereby waives any claim in its favor against RPC by way of subrogation or indemnification which may arise during the Initial Term or any Extended Term of this Agreement or any and all loss of, or damage to, any of the Client's property or for bodily injury which loss, damage or bodily injury is covered by insurance to the extent that such loss is recovered under such policies of insurance as are required in this Agreement.

   h.   Specific Continuing Covenant

Client and RPC each agree to keep in full force and effect, at all times during the Initial Term and any Extended Term of this Agreement, all insurance policies required under this Agreement.

6.   **COMPLIANCE WITH LAWS**

   a.   General

Client agrees, at its expense, to provide reasonable accommodations for all Employees having a disability as defined in Title 1 of the Americans with Disabilities Act.

   b.   Americans With Disabilities Act

Client agrees, at its expense to provide reasonable accommodations for all Employees having a disability as defined in Title 1 of the Americans with Disabilities Act. Client also agrees to indemnify and hold RPC harmless from any and all claims arising from Client's failure to provide reasonable accommodations, and for any expenses incurred by RPC for having to make reasonable accommodations as a result of Client's refusal to do so, as further described in Paragraph 9.

7.   **ADMINISTRATION**

RPC acknowledges that it is responsible for such administrative employment matters as the payment of all federal, state and local employment taxes, the providing of workers' compensation coverage, and the providing of non-obligatory fringe benefit programs for the Employees.

8.   **WORK ENVIRONMENT**

Client agrees that it will comply with all laws, regulations, ordinances, directives and rules imposed by controlling federal, state and local government authorities including, but not limited to, The Americans With Disabilities Act, Title VII of the Civil Rights Act, the Occupational Safety and Health Act, the Fair Labor Standards Act and the Family Medical Leave Act. If applicable, and that it will within twenty-four (24) hours,

# RPC Employer Services, Inc.
## Service Agreement

report all accidents and injuries to RPC. Client agrees to comply, at its expense, with any specific directives from the workers' compensation insurance carrier, if any, or any governmental agency having jurisdiction over the work place or the Employees' health and safety. Client shall provide and ensure use of all personal protective equipment as required by federal, state or local law, regulations, ordinances, directives or rules, or as deemed necessary by RPC or by its workers' compensation carrier, if any. RPC workers' compensation carrier, if any, has the right at any scheduled mutually convenient time, to inspect Client's premises and operations, but is not obligated to undertake such inspections. RPC or its carrier, if any, may give reports to the Client of the results of any inspections. Neither any carrier nor RPC warrants the results of any such inspections or the absence thereof, or that the operations and/or premises are in compliance with any laws regulations, codes or standards.

## 9.   HOLD HARMLESS

Client hereby agrees to indemnify, defend and hold RPC harmless from and against any and all claims, damages, losses, judgments, fees, expenses and costs (including court costs and attorneys' fees) and liabilities and obligations of any nature whatsoever, contingent or otherwise, known or unknown, as though expressly set forth and described herein, which Client may incur, suffer, become liable for, or which may be asserted or claimed against Client arising out of or related to the acts, errors or omissions of Client or any director, officer, employee or other agent of Client, including, without limitation, any and all claims in any way related to the matters contained in Paragraph 5(f) and 6 or any violation of this Agreement by Client or RPC's efforts to enforce this indemnity. Client shall take all reasonable measures to inform creditors and other third parties that all Employees assigned to Client to fill the Job Function Positions are employees of RPC, and that RPC is not responsible for Client's debts, acts, errors or omissions except as specifically set forth in this Agreement.

Notwithstanding anything to the contrary contained herein, RPC shall not be liable in any in any event for Client's loss of profits, business, goodwill, or other consequential, special, or incidental damages.

## 10.   LATE CHARGE

Should payment of any amounts due RPC not be made when due, Client shall pay a monthly late charge at a rate of one and one-half percent (1 ½%) per month on all past due invoices, or the maximum rate permitted by law, whichever is less.

## 11.   DEFAULT

Client shall be in default of this Agreement, and said default shall constitute a material breach hereof, if:

a.   Client shall fail to pay the Fee;

b.   Client shall fail to report timely employee wage information each and every pay period

c.   Client shall commit any act that interferes with the rights of RPC as the employer of the Employees provided under this Agreement;

d.   Client shall fail to provide any insurance required under this Agreement;

e.   Client shall fail to comply with any law, regulations, ordinance, directive, or rule regarding the health and safety of Employees from RPC's workers compensation carrier, if any or any governmental agency;

f.   Client shall commit any act that disrupts any of the rights of RPC as the employer of the Employees provided for under this Agreement;

g.   Client or any guarantor of Client's obligations hereunder shall generally not pay its debts as they become due;

h.   Client or any guarantor of Client's obligations hereunder shall admit its inability to pay its debts or shall make a general assignment for the benefit of creditors;

i.   Client or any guarantor of Client's obligations hereunder shall commence any case, proceeding or other action seeking to have an order for relief entered on its behalf as debtor or to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it, or its debts, under any law relating

# RPC Employer Services, Inc.
## Service Agreement

to bankruptcy, insolvency, reorganization or relief of debtors or seeking appointment of a receiver, trustee, custodian or other similar official for Client or for all or any substantial part of Client's property;

j.  Client or any guarantor of Client's obligations hereunder shall take any corporate or other action to authorize or to contemplate any of the actions set forth above; or

k.  Client shall fail to comply with any applicable governmental law, regulation, ordinance, directive or rule, whether federal, state or local.

## 12.  EFFECT OF BANKRUPTCY OR INSOLVENCY

In the event any of the actions specified in the immediately preceding paragraph occurs, RPC shall have no further obligation to advance any funds on behalf of Client pursuant to this Agreement for any purpose whatsoever unless RPC shall have such funds in its possession at the time any payment or advance is due under this Agreement.

## 13.  EMPLOYEES

For purposes of this Agreement, the term "Employee," whether singular or plural, shall mean such individuals as shall be assigned by RPC to fill the Job Function Positions of Client under this Agreement. All such individuals covered by this agreement shall be deemed to be assigned to Client on a permanent basis.

## 14.  WARRANTY

NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, RPC MAKES NO COVENANT, REPRESENTATION, WARRANTY, OR AGREEMENT OF ANY KIND, EXPRESS OR IMPLIED, TO CLIENT OR ANY OTHER PARTY WITH RESPECT TO THE PERFORMANCE BY EMPLOYEES OF SERVICES RENDERED TO CLIENT AS CONTEMPLATED HEREUNDER. UNDER NO CIRCUMSTANCES SHALL RPC TOTAL LIABILITY OF ANY KIND ARISING OUT OF OR RELATED TO THIS AGREEMENT (INCLUDING BUT NOT LIMITED TO ANY WARRANTY CLAIMS HEREUNDER REGARDLESS OF THE FORUM AND REGARDLESS OF WHETHER ANY ACTION OR CLAIM IS BASED ON CONTRACT, TORT, STRICT LIABILITY OR OTHERWISE) EXCEED THE TOTAL AMOUNT PAID BY CLIENT TO RPC AS SERVICE FEES HEREUNDER (DETERMINED AS OF THE DATE OF ANY FINAL JUDGMENT IN SUCH ACTION).

## 15.  MISCELLANEOUS

a.  Entire Agreement

This Agreement constitutes the entire understanding and agreement of the parties hereto with respect to the covenants contemplated hereby, and supersedes all prior oral and written agreements and understandings of the parties relating to the subject matter hereof.

b.  Attorneys' Fees

In the event that any action is brought by either party hereto as a result of a breach or a default in any provision of this Agreement, the prevailing party in such action shall be awarded reasonable attorneys' fees and costs in addition to any other relief to which the party may be entitled.

c.  Survival of Agreement

All covenants, representations, warranties, and agreements made herein shall survive the execution and delivery of this Agreement. Wherever in this Agreement reference is made to any of the parties hereto, such reference shall be deemed to include the corporate successors in interest, legal representatives, heirs, assigns, and any other successors of such party.

d.  Construction

This Agreement shall be governed by, construed and enforced under the substantive, and not conflicts, laws of the State of Ohio. The forum for any litigation hereunder shall be the federal or state, as appropriate, courts located in Trumbull County, Ohio. An action for breach of this Agreement or any other action otherwise arising out of or related to this Agreement must be commenced within one (1) year from the date

# RPC Employer Services, Inc.
## Service Agreement

the right, claim, demand or cause of action shall first occur, or be barred forever. The headings appearing herein are for convenience only, and are without legal effect.

    e.    <u>Waiver of Breach</u>

Failure by either party at any time to require performance by the other party or to claim a breach of any provision of this Agreement will not be construed as a waiver of any subsequent breach nor affect the effectiveness of this Agreement, nor any part thereof, nor prejudice either party with regard to any such subsequent action.

    f.    <u>Notices</u>

Any notice or demand to be given hereunder by either party to the other shall be effected by personal delivery in writing or a certified mail, postage paid, return receipt requested, and shall be addressed to the party's principal place of business set forth above, but each party may change the address by written notice in accordance with this paragraph.

    g.    <u>Validity</u>

This Agreement shall be valid and enforceable only after it has been signed by both parties. In the event any term, warrant, covenant, condition, or provision of this Agreement is held to invalid or unenforceable, the balance of this Agreement shall remain in full force and effect and shall stand as if the unenforceable part did not exist.

    h.    <u>No Partnership</u>

Notwithstanding any provision to the contrary herein, RPC, under this Agreement or by any action taken pursuant hereto, shall not be deemed a partner, joint venture, or joint employer with Client.

In witness whereof, the parties have executed this Agreement as of the date and year first written above.

RPC EMPLOYER SERVICES, INC.

By: _____    3-27-01
    Daniel J. D'Alio, President          Date


NATIONAL INDOOR FOOTBALL LEAGUE, L.L.C.

By: _Carolyn Shiver President_ 3/21/01
    Carolyn Shiver, President         Date

**NOTICE: THIS AGREEMENT IS SUBJECT TO THE FINAL APPROVAL OF THE HOME OFFICE AND SHALL NOT BECOME EFFECTIVE UNTIL SUCH TIME AS APPROVAL IS GRANTED AS EVIDENCED BY THE ABOVE ENDORSEMENT OF AN OFFICER OF RPC EMPLOYER SERVICES, INC.**

## EFFECTIVE STARTING DATE:

    Based on each team's first game of the 2001 season according to the official published schedule, which shall be made a part of this agreement.

# RPC Employer Services, Inc.
## Service Agreement

## FEE STRUCTURE STATEMENT

| Description | Amount | Per |
|---|---|---|
| Payroll Frequency: | | Weekly |
| Service Fee: | | |
| Players, coaches | $18.00 | Person per weekly pay period |
| Office Staff | $12.00 | Person per weekly pay period |
| FICA (Employer Match) | 7.65% | Of taxable wages up to taxable limits |
| FUTA (Federal Unemployment) | 0.80% | Of taxable wages up to taxable limits |
| SUTA (State Unemployment) | 2.75% | Of taxable wages up to taxable limits |
| Workers' Compensation: | | |
| -Players, Coaches, Code 9179: | 11.65% | Per $100 of Payroll |
| -Office staff, Code 8810: | 0.52% | Per $100 of Payroll |
| DEDUCTIBLE: | $1000 | PER CLAIM AS ASSESSED TO EACH TEAM BY THE LEAGUE MANAGEMENT |
| Overnight Delivery | $13.00 | Per Payroll Delivery as requested |
| Direct Debit Fee | $5.00 | Per Invoice |
| One-time Setup | $495.00 | |

# RPC Employer Services, Inc.
## Service Agreement
### SECURITY DEPOSIT

As additional security for performance of the obligation incurred, Client hereby grants to and deposits with RPC cash and/or an irrevocable standby letter of credit in an amount equal to one (1) estimated payroll cycle inclusive of gross payroll and all applicable federal, state and local taxes, as well as, the total estimated employee benefits paid, for a total of $ (see NOTE below). Said sum shall be held by RPC until such time as the Agreement between the parties is terminated and any and all obligations, indebtedness, or other liabilities of Client have been satisfied or applied hereto.

RPC EMPLOYER SERVICES, INC.

By _____
    Daniel J. D'Alio, President

NATIONAL INDOOR FOOTBALL LEAGUE, L.L.C.

By _Carolyn Shiver_  President
    Carolyn Shiver, President

Do not cut payroll checks for teams unless wire transfers are received.

NOTE: Security deposit will be waived so long as wire transfer or direct debit payment is received by RPC on Wednesday prior to each Friday pay date. If this term is not met, then a Security Deposit will be necessary in order to continue service.



MONTANA
**STATEFUND**

5 South Last Chance Gulch · P.O. Box 4759 · Helena, MT 59604–4759
Curtis E. Larsen, Legal Counsel: 1–406–444–7772, Fax 1–406 444–1493
Customer Service: 1–800–332–6102 or 406–444–6500

June 24, 2003

Carolyn Shivers
NIFL
600 Loire Ave.
LaFayette, LA  70507

      RE:  Workers' compensation claims for Billings Outlaws' players

Dear Ms. Shivers:

I represent the Montana State Fund of Helena, Montana.  Ryan Sedlak of the Leventry law firm suggested I contact you about the Billings Outlaws, which is a NIFL team in Billings, Montana. I have tried to reach you by telephone several times, but have been unsuccessful in doing so.

The Montana State Fund is the state-owned workers' compensation insurance carrier.  We provide workers' compensation insurance coverage for Montana-based employers.  The Montana State Fund insured DSA Sports, Inc., dba the Billings Outlaws, in 2001.  The State Fund's policy was intended to cover only persons directly employed by DSA Sports, such as their management and office staff.  We did not intend to cover the players for workers' compensation purposes. This was the period of time during which the NIFL had some kind of relationship with RPC Holdings to provide players to the NIFL teams.  We understand that RPC attempted to obtain workers' compensation coverage for the players from the Ohio Bureau of Workers' Compensation, but that was not possible.  The NIFL is now engaged in litigation with RPC.

During this period of time, several players on the Billings Outlaws' team sustained work-related injuries, and sought medical treatment as a result.  Enclosed are copies of documentation of these injuries and medical bills.  The bills total approximately $ 5,077.97.  I believe these injuries are resolved, and that there are no wage losses associated with any of them.

The State Fund denied coverage of these claims, as the players were not employees of DSA Sports.  Ultimately, the Montana Uninsured Employers' Fund (UEF) accepted responsibility and paid the medical bills.  The uninsured employer in this case is either RPC or the NIFL or both. The UEF has the statutory right under Montana law to seek reimbursement from the uninsured employer.  However, UEF is now seeking reimbursement from the Montana State Fund.  The UEF's claim is based on Montana statutory provisions that may make DSA Sports, and ultimately the State Fund, legally responsible for the claims.  If we become liable for payment of the claims, then the State Fund will have the legal right to seek reimbursement from the NIFL.

We wish to discuss this situation with you, and determine what the position of the NIFL is, and whether you are willing and able to pay the claims for the Billings Outlaws' players.  If the NIFL is not to do so, we need to know the reasons why, and whether an arrangement for payment over time could be worked out.

EXHIBIT

tabbies®

E

Page 2

We have a mandated mediation conference with the UEF scheduled for next Monday, June 30, 2003. Please contact me as soon as possible so that we know what the position of the NIFL is with respect to these claims.

Very truly yours,

CURTIS E. LARSEN
Legal Counsel

Cc: Dennis Small

# State of Montana
## Department of Labor & Industry
### Judy Martz, Governor



Employment Relations Division

WC Regulation Bureau
Uninsured Employers' Fund

January 15, 2003

NATIONAL INDOOR FOOTBALL LEAGUE
ATTN  CAROLYN SHIVER
600 LOIRE AVE
LAFAYETTE LA 70507

RE:    Penalty #13919
       NATIONAL INDOOR FOOTBALL LEAGUE

Dear Sir/Madam:

There is an outstanding debt due the Uninsured Employers' Fund for the uninsured period of April 14, 2001 through August 31, 2001.  The total due is $16,854.90.  A lien has been filed against you on November 8, 2002.

If you do not contact us by January 22, 2003, we will transfer this debt to a collection agency for collection.  The collection agency will add interest and collection fees to your debt.

Sincerely,

Diana Emmons

Diana Emmons, Compliance Specialist II
Uninsured Employers' Fund
Phone:  (406) 444-1375

DE/hk

OWCA

KAREEM VANCE            RECEIVED        OFFICE OF WORKERS' COMPENSATION

VERSUS NO: 01-0393-2002 JUL 30  PM 2:27                    DISTRICT 1E

MONROE BAYOU BEAST  DISTRICT 1E-MONROE          STATE OF LOUISIANA

                              02-4361

FILED: _____          _____

                                          DEPUTY CLERK OF COURT

---

### JUDGMENT

---

This matter having come before this Court for a Trial on July 25, 2002 and after argument
and submissions of evidence, and the law and evidence being in favor thereof:

IT IS ORDERED, ADJUDGED AND DECREED that Employee/Plaintiff, KAREEM
VANCE is awarded $2,528.36 for loss wages, any and all medicals expenses including but not
limited to: Speciality Imaging $800.00; Diagnostic Imaging $1,023.00; University Sports Medicine
$1,266.50; Northeast LA Radiology Associates $155.00; Cornerstone Rehab of Batesville $959.00,
and Cornerstone Rehab of Water Valley $1,018.00.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Defendant, Carolyn
Shiver on behalf of the Monroe Bayou Beast, is to pay KAREEM VANCE mileage in the amount
of $540.40, $2,000 for penalties and $3,000 in attorney fees to Jeffrey D. Guerriero.

Judgment rendered, signed and filed on the 31 day of July, 2002.

THUS DONE and SIGNED this 31 day of July, 2002, in chambers at
Monroe, Ouachita Parish, Louisiana.

_____
JUDGE BRENZA IRVING

EXHIBIT

F

A TRUE CO

APPROVED AS TO FORM:

_____
JEFFREY D. GUERRIERO FOR
Plaintiffs,

# Leventry Law Office
Attorneys at Law

Timothy C. Leventry, LL.M.*

John M. Haschak**
Forrest B. Fordham, III***
Mindi Jo Nagy

Mary Beth Krause (Paralegal)
*Legal Masters Degree in Taxation
**Registered Patent Attorney
***Also Admitted to NY Bar

E-mail addresses:

tleventry@charterpa.com
jhaschak@charterpa.com
ffordham@charterpa.com
mnagy@charterpa.com

May 15, 2002

Action Potential Physical Therapy, Inc.
813 Bayou Pines West
Lake Charles, LA 70605

      **RE:   Robert Hulett**

Dear Patricia Wade:

      I am in receipt of your May 2, 2002 correspondence regarding Robert Hulett. I tried to contact Action Potential Physical Therapy at (318) 494-7546, the number indicated on the account statement included with your letter. I received a message, however, that this telephone number was incorrect. Accordingly, I am sending this letter in lieu of a telephone call.

      Since the 2001 National Indoor Football League Season, the Ohio Bureau of Workers' Compensation (hereinafter the Bureau) has denied all workers compensation claims submitted by NIFL players. The Bureau had issued two certificates of coverage to the NIFL effective during the 2001 football season but denied claims once players submitted them. Accordingly, the NIFL has continuously appealed all denials of the workers' compensation claims submitted. The Bureau, however, has maintained they lack jurisdiction over these claims.

      RPC is the Employer Service group who misrepresented to the NIFL that the Ohio Bureau of Workers' Compensation would in fact cover NIFL player worker compensation claims. The employer service group was to handle NIFL workers' compensation issues and made fraudulent misrepresentations to the NIFL regarding its workers' compensation situation

      At this juncture, the NIFL has filed suit against RPC Employer Services relative to the workers' compensation issue. RPC is the Employer Service group who was to handle NIFL workers' compensation issues and made fraudulent misrepresentations to the NIFL regarding its workers' compensation situation. The Court has not yet scheduled a hearing date on this matter.

      Thank you for your patience thus far with the delinquent balance on Robert Hulett's account. Please note, the NIFL has been and is continuing to work diligently to rectify the workers' compensation situation for all NIFL players.

                                   Very truly yours,

                                   Mindi Jo Hodge
                                   Attorney at Law

MJH: jg

**EXHIBIT**

tabbies®

G



# Leventry, Haschak, Rodkey & Klementik, LLC
## Attorneys at Law

Sender's E-mail:
tleventry@lhrklaw.com

Timothy C. Leventry, LL.M.*
John M. Haschak**
Randall C. Rodkey
David C. Klementik, LL.M*

Terry L. Graffius

Mary Beth Krause (Paralegal)
*Legal Masters Degree in Taxation
**Registered Patent Attorney



July 17, 2003

Open MRI
Attn: Sheila
P.O. Box 789
Ocean Spring, MS 39566

     RE:   **NIFL v. RPC EMPLOYER SERVICES**

Dear Sheila:

     Please be advised that we represent the NIFL with regard to its unpaid worker's compensation claims. In conversations with our office, you have indicated that Open MRI is owed for unpaid medical bills which should have been covered under worker's compensation. This letter outlines the factual details of our suit against the RPC Employer Services for unpaid workers compensation claims.

     During the 2001 NIFL season, the NIFL attempted to procure worker's compensation insurance through our RPC Employer Services. RPC Employer Services entered into an agreement with the NIFL to provide payroll and worker's compensation coverage for NIFL players pursuant to an agreement between the parties signed on March 21, 2001. Despite the contract and despite the NIFL's performance of its obligations under the contract, RPC failed to provide worker's compensation coverage for all NIFL employees.

     On March 22, 2002, on behalf of the NIFL, we filed suit in Federal Court in the Western District of Pennsylvania alleging violations of RICO, breach of contract and fraud because nearly three-quarters of a million dollars of worker's compensation claims went uncovered due to RPC's failure to procure worker's compensation insurance. RPC Employer Services represented to the NIFL that the State of Ohio would cover all NIFL teams and all support staff under the Ohio Bureau Worker's Compensation Insurance if the NIFL had an office in Ohio. But RPC Employer Services knew that even if the NIFL moved its headquarters to Ohio coverage would not be possible in Ohio

because all teams were located in other states, and Ohio does not cover those teams employees who did not bear a relationship to Ohio.  In fact, on March 15, 2001, RPC Employer Service's representatives met with representatives from the Ohio Bureau of Worker's Compensation during which the Ohio Bureau of Worker's Compensation representatives instructed RPC Employer Services that coverage would not be possible for all NIFL players who did not work in the State of Ohio.  In reliance upon the RPC Employer Service's promises, the NIFL assembled employment documentation to secure worker's compensation coverage after the agreement between the parties was signed.  Furthermore, the NIFL paid over $9,000.00 in worker's compensation premiums to RPC Employer Services between March 28, 2001, the start date of the 2001 NIFL season and April 16, 2001.   On April 13, 2001, RPC sent further instructions to the NIFL with regard to documentation that was needed to secure worker's compensation coverage.  Then, abruptly and without notice, RPC Employer Services terminated the contract with the NIFL on April 16, 2001 without giving the NIFL to complete the requested actions outlined in the April 13 letter sent by RPC Employee Services to the NIFL.  We believe that RPC Employer Services terminated its agreement with the NIFL because through their own errors they realized that worker's compensation coverage was not possible in the State of Ohio for all NIFL employees.

Discovery indicates and RPC Employer Services pleadings show that at no time did RPC Employer Services fully understand Ohio Worker's Compensation Law.  Despite a clear explanation from the Ohio Bureau of Worker's Compensation, we believe that it is evident that RPC Employer Services negligently and fraudulently pursued worker's compensation coverage in Ohio for all NIFL employees.  Even if the NIFL moved its headquarters to Ohio, as RPC Employer Services suggested, Ohio Worker's Compensation Law is clear that only those employees physically working in the State of Ohio would be covered under Ohio Worker's Compensation.

The NIFL suit against RPC Employer Services involves damages for all worker's compensation claims that have been unpaid including Open MRI's bills.  At the time of RPC Employer Service's perpetration of fraud and breach of contract, RPC Employer Services had errors and omissions insurance in effect.  We believe that the NIFL has a strong claim against RPC Employer Services, nevertheless, before we enter into settlement negotiations, we will be taking depositions of representatives of the Ohio Bureau of Worker's Compensation who met with RPC Employer Service representative in mid March, 2001.

Pursuant to the case management order, discovery must completed by mid October, 2003.  As we are anticipating entering into settlement negotiations near the end of the completion of discovery, we encourage you to continue to forbear in seeking reimbursement for your unpaid medical bills.  Presently, the NIFL is unable to pay the nearly three-quarters of a million dollars in unpaid worker's compensation claims, therefore, numerous creditors from various states have monitored the progress of our suit in anticipation of receiving reimbursement.

The NIFL appreciates your cooperation in this matter and looks forward to successfully resolving its dispute with RPC Employer Services in order that all worker's compensation claims will be paid.  If you have any questions or concerns, please feel free to contact my office.

Thank you.

Very truly yours,

Timothy C. Leventry, LL.M
Attorney at Law

TCL/rjs
cc:     Carolyn Shiver



# Leventry, Haschak, Rodkey & Klementik, LLC
### Attorneys at Law

Timothy C. Leventry, LL.M.*
John M. Haschak**
Randall C. Rodkey
David C. Klementik, LL.M*

Terry L. Graffius

Mary Beth Krause (Paralegal)
*Legal Masters Degree in Taxation
**Registered Patent Attorney

Sender's E-mail:
tleventry@lhrklaw.com



July 17, 2003

Santco, Inc.
Attn: Theresa
345 Main Street
P.O. Box 1208
Johnstown, Pa 15907

RE:    NIFL v. RPC EMPLOYER SERVICES

Dear Theresa:

Please be advised that we represent the NIFL with regard to its unpaid worker's compensation claims. In conversations with our office, you have indicated that various providers are owed for unpaid medical bills which should have been covered under worker's compensation. This letter outlines the factual details of our suit against the RPC Employer Services for unpaid workers compensation claims.

During the 2001 NIFL season, the NIFL attempted to procure worker's compensation insurance through our RPC Employer Services. RPC Employer Services entered into an agreement with the NIFL to provide payroll and worker's compensation coverage for NIFL players pursuant to an agreement between the parties signed on March 21, 2001. Despite the contract and despite the NIFL's performance of its obligations under the contract, RPC failed to provide worker's compensation coverage for all NIFL employees.

On March 22, 2002, on behalf of the NIFL, we filed suit in Federal Court in the Western District of Pennsylvania alleging violations of RICO, breach of contract and fraud because nearly three-quarters of a million dollars of worker's compensation claims went uncovered due to RPC's failure to procure worker's compensation insurance. RPC Employer Services represented to the NIFL that the State of Ohio would cover all NIFL teams and all support staff under the Ohio Bureau Worker's Compensation Insurance if the NIFL had an office in Ohio. But RPC Employer Services

knew that even if the NIFL moved its headquarters to Ohio coverage would not be possible in Ohio because all teams were located in other states, and Ohio does not cover those teams employees who did not bear a relationship to Ohio.  In fact, on March 15, 2001, RPC Employer Service's representatives met with representatives from the Ohio Bureau of Worker's Compensation during which the Ohio Bureau of Worker's Compensation representatives instructed RPC Employer Services that coverage would not be possible for all NIFL players who did not work in the State of Ohio.  In reliance upon the RPC Employer Service's promises, the NIFL assembled employment documentation to secure worker's compensation coverage after the agreement between the parties was signed.  Furthermore, the NIFL paid over $9,000.00 in worker's compensation premiums to RPC Employer Services between March 28, 2001, the start date of the 2001 NIFL season and April 16, 2001.  On April 13, 2001, RPC sent further instructions to the NIFL with regard to documentation that was needed to secure worker's compensation coverage.  Then, abruptly and without notice, RPC Employer Services terminated the contract with the NIFL on April 16, 2001 without giving the NIFL to complete the requested actions outlined in the April 13 letter sent by RPC Employee Services to the NIFL.  We believe that RPC Employer Services terminated its agreement with the NIFL because through their own errors they realized that worker's compensation coverage was not possible in the State of Ohio for all NIFL employees.

Discovery indicates and RPC Employer Services pleadings show that at no time did RPC Employer Services fully understand Ohio Worker's Compensation Law. Despite a clear explanation from the Ohio Bureau of Worker's Compensation, we believe that it is evident that RPC Employer Services negligently and fraudulently pursued worker's compensation coverage in Ohio for all NIFL employees.  Even if the NIFL moved its headquarters to Ohio, as RPC Employer Services suggested, Ohio Worker's Compensation Law is clear that only those employees physically working in the State of Ohio would be covered under Ohio Worker's Compensation.

The NIFL suit against RPC Employer Services involves damages for all worker's compensation claims that have been unpaid.  At the time of RPC Employer Service's perpetration of fraud and breach of contract, RPC Employer Services had errors and omissions insurance in effect.  We believe that the NIFL has a strong claim against RPC Employer Services, nevertheless, before we enter into settlement negotiations, we will be taking depositions of representatives of the Ohio Bureau of Worker's Compensation who met with RPC Employer Service representative in mid March, 2001.

Pursuant to the case management order, discovery must completed by mid October, 2003. As we are anticipating entering into settlement negotiations near the end of the completion of discovery, we encourage you to continue to forbear in seeking reimbursement for your unpaid medical bills.  Presently, the NIFL is unable to pay the nearly three-quarters of a million dollars in unpaid worker's compensation claims, therefore, numerous creditors from various states have monitored the progress of our suit in anticipation of receiving reimbursement.

The NIFL appreciates your cooperation in this matter and looks forward to successfully resolving its dispute with RPC Employer Services in order that all worker's compensation claims will be paid.  If you have any questions or concerns, please feel free to contact my office.

      Thank you.

                            Very truly yours,

                            Timothy C. Leventry, LL.M
                            Attorney at Law

TCL/rjs
cc:     Carolyn Shiver



# Leventry, Haschak, Rodkey & Klementik, LLC

### Attorneys at Law

Timothy C. Leventry, LL.M.*
John M. Haschak**
Randall C. Rodkey
David C. Klementik, LL.M*

Terry L. Graffius

Mary Beth Krause (Paralegal)
*Legal Masters Degree in Taxation
**Registered Patent Attorney

**Sender's E-mail:**

tleventry@lhrklaw.com



September 3, 2003

Southern Medical Business Services (SMBS)
Attn: Pat Logan
P.O. Box 8647
Mobile, AL 36689

    **RE:   NIFL v. RPC EMPLOYER SERVICES**

Dear Mr. Logan:

    Please be advised that we represent the NIFL with regard to its unpaid worker's compensation claims. In conversations with our office, you have indicated that both Springhill Memorial Hospital and Springhill Diagnostic treated Dominicke Haston and are owed for unpaid medical bills which should have been covered under worker's compensation. This letter outlines the factual details of our suit against the RPC Employer Services for unpaid workers compensation claims.

    During the 2001 NIFL season, the NIFL attempted to procure worker's compensation insurance through RPC Employer Services. RPC Employer Services entered into an agreement with the NIFL to provide payroll and worker's compensation coverage for NIFL players pursuant to an agreement between the parties signed on March 21, 2001. Despite the contract and despite the NIFL's performance of its obligations under the contract, RPC failed to provide worker's compensation coverage for all NIFL employees.

    On March 22, 2002, on behalf of the NIFL, we filed suit in Federal Court in the Western District of Pennsylvania alleging violations of RICO, breach of contract and fraud because nearly three-quarters of a million dollars of worker's compensation claims went uncovered due to RPC's failure to procure worker's compensation insurance. RPC Employer Services represented to the NIFL that the State of Ohio would cover all NIFL teams and all support staff under the Ohio Bureau Worker's Compensation

Insurance if the NIFL had an office in Ohio. But RPC Employer Services knew that even if the NIFL moved its headquarters to Ohio coverage would not be possible in Ohio because all teams were located in other states, and Ohio does not cover those teams employees who did not bear a relationship to Ohio. In fact, on March 15, 2001, RPC Employer Service's representatives met with representatives from the Ohio Bureau of Worker's Compensation during which the Ohio Bureau of Worker's Compensation representatives instructed RPC Employer Services that coverage would not be possible for all NIFL players who did not work in the State of Ohio. In reliance upon the RPC Employer Service's promises, the NIFL assembled employment documentation to secure worker's compensation coverage after the agreement between the parties was signed. Furthermore, the NIFL paid over $9,000.00 in worker's compensation premiums to RPC Employer Services between March 28, 2001, the start date of the 2001 NIFL season and April 16, 2001. On April 13, 2001, RPC sent further instructions to the NIFL with regard to documentation that was needed to secure worker's compensation coverage. Then, abruptly and without notice, RPC Employer Services terminated the contract with the NIFL on April 16, 2001 without giving the NIFL to complete the requested actions outlined in the April 13 letter sent by RPC Employee Services to the NIFL. We believe that RPC Employer Services terminated its agreement with the NIFL because, through their own errors, they realized that worker's compensation coverage was not possible in the State of Ohio for all NIFL employees.

Discovery indicates and RPC Employer Services pleadings show that at no time did RPC Employer Services fully understand Ohio Worker's Compensation Law. Despite a clear explanation from the Ohio Bureau of Worker's Compensation, we believe that it is evident that RPC Employer Services negligently and fraudulently pursued worker's compensation coverage in Ohio for all NIFL employees. Even if the NIFL moved its headquarters to Ohio, as RPC Employer Services suggested, Ohio Worker's Compensation Law is clear that only those employees physically working in the State of Ohio would be covered under Ohio Worker's Compensation.

The NIFL suit against RPC Employer Services involves damages for all worker's compensation claims that have been unpaid including Springhill Memorial's and Springhill Diagnostic's bills. At the time of RPC Employer Service's perpetration of fraud and breach of contract, RPC Employer Services had errors and omissions insurance in effect. We believe that the NIFL has a strong claim against RPC Employer Services, nevertheless, before we enter into settlement negotiations, we will be taking depositions of representatives of the Ohio Bureau of Worker's Compensation who met with RPC Employer Service representative in mid March, 2001.

Pursuant to the case management order, discovery must completed by mid October, 2003. As we are anticipating entering into settlement negotiations near the end of the completion of discovery, we encourage you to continue to forbear in seeking reimbursement for your unpaid medical bills. Presently, the NIFL is unable to pay the nearly three-quarters of a million dollars in unpaid worker's compensation claims, therefore, numerous creditors from various states have monitored the progress of our suit in anticipation of receiving reimbursement.

The NIFL appreciates your cooperation in this matter and looks forward to successfully resolving its dispute with RPC Employer Services in order that all worker's compensation claims will be paid. If you have any questions or concerns, please feel free to contact my office.

Thank you.

Very truly yours,

Timothy C. Leventry, LL.M
Attorney at Law

TCL/rjs
Enclosures
cc:     Carolyn Shiver

122

1  really tried to eliminate that down

2  to end of season end of lost work

3  time, so to speak.

4  Q.        So to the extent that

5  medical bills are not paid, are you

6  just delaying the payment of those,

7  although they have been sent?

8  A.        We keep them informed as

9  to how the case is going and now you

10 guys are at a schedule, so we have

11 given them that schedule.  We notify

12 them and, you know, we first of all,

13 over so much on the dollar just to

14 pay them off.  And now that they

15 haven't --- some took that, some

16 didn't.  The ones that didn't, we

17 keep them notified how the case is

18 going, if they reach a point of

19 saying, look we have to have

20 something, then we put them on a

21 payment plan and move them forward.

22 So we think we've done a business

23 approach.  The claims are so large,

24 if we would pay them off it would

25 bankrupt us probably.  Most of the

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

**EXHIBIT**

H

74

1   function position.

2   A.      Covering my employees.

3   Q.      It doesn't say that.  It says

4   covering all employees filling job

5   function positions reading quote.

6   A.      Well, we'd have to read the

7   whole agreement to answer the

8   question.

9   Q.      My question is, in order to

10  ensure that these people became your

11  employees, RPC's employees to be

12  covered by your Ohio Workers'

13  Compensation coverage, what steps did

14  you take to make sure that the NIFL

15  made them properly your employees?

16  A.      On or about mid January we had

17  delivered all of the employee files,

18  somewhere as up of 700 of them.  We

19  initiated --- Carolyn Shiver asked

20  that all applications be controlled

21  from her office.  She wanted central

22  control of every team and we complied

23  in order to get the necessary

24  documentation to actually even have

25  proper paperwork.  I went to visit

EXHIBIT

I