# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **NATIONAL INDOOR FOOTBALL** | : | |
| **LEAGUE L.L.C.,** | : | **CIVIL DIVISION** |
| **Plaintiff** | : | **NO. CA 2 - 548** |
| | : | |
| **v.** | : | **TYPE OF PLEADING:** |
| | : | |
| | : | **Reply to the Defendant's Motions in** |
| **R.P.C. EMPLOYER SERVICES, INC.,** | : | **Limine with Respect to Plaintiff's Damages** |
| | : | |
| **Defendant.** | : | **JURY TRIAL DEMANDED** |
| | : | |
| | : | |
| | : | **FILED ON BEHALF OF:** |
| | : | |
| | : | **Plaintiff** |
| | : | |
| | : | **COUNSEL FOR PLAINTIFF:** |
| | : | |
| | : | **TIMOTHY C. LEVENTRY, LL.M** |
| | : | **LEVENTRY, HASCHAK** |
| | : | **& RODKEY, LLC** |
| | : | **1397 EISENHOWER BOULEVARD** |
| | : | **RICHLAND SQUARE III, SUITE 202** |
| | : | **JOHNSTOWN, PA 15904** |
| | : | **(814) 266-1799** |

L:\N\National Indoor Football League 01-214\Reply to Defendant's Motions in Limine with Respect to Damages.wpd

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **NATIONAL INDOOR FOOTBALL** | : | |
| **LEAGUE L.L.C.,** | : | **CIVIL DIVISION** |
| **Plaintiff** | : | **NO. CA 2 - 548** |
| | : | |
| **v.** | : | **TYPE OF PLEADING:** |
| | : | |
| | : | **Reply to the Defendant's Motions in** |
| **R.P.C. EMPLOYER SERVICES, INC.,** | : | **Limine with Respect to Plaintiff's Damages** |
| | : | |
| **Defendant.** | : | |

**REPLY TO DEFENDANT'S MOTIONS IN LIMINE
WITH RESPECT TO  PLAINTIFF'S DAMAGES**

AND NOW, comes the Plaintiff, NATIONAL INDOOR FOOTBALL LEAGUE, L.L.C., by

and through its attorneys, Leventry, Haschak, & Rodkey, LLC, and files the foregoing Reply to the

Defendant RPC Employers, Inc.'s ("RPC") Motions in Limine with Respect to the Plaintiff's

Damages:

1.      Admitted.

2.      Admitted in part. Denied in part.  It is admitted the NIFL consisted of eighteen (18)

teams in 2001, however, it is denied only ten (10) teams submitted necessary information to RPC.

RPC fails to distinguish between payroll and workers' compensation coverage services, as the two

are clearly distinguished in the Service Agreement.  Information needed to process payroll is not

related to information necessary to establish workers' compensation coverage, which, by RPC's

stipulation to liability, it did not do.  It is the NIFL's position that thirteen (13) teams submitted

necessary information to RPC for workers' compensation purposes.  Players for thirteen (13)  NIFL

teams including the Bayou Beast, Southern Oregon Heat and the Mobile Seagulls submitted form C-110's. Copies of these C-110's have been provided to RPC's counsel. Furthermore, the NIFL filed player appeals for 13 teams during the Administrative Appeal process of the Ohio Bureau of Workers' Compensation. Under these circumstances, the extent to which the NIFL submitted information to RPC for workers' compensation purposes is clearly a question of fact which cannot be decided by a Motion in Limine.

3.      Denied. To the extent the averments of Paragraph 3 purport to paraphrase or to interpret the contents of the Service Agreement, said averments are denied on the grounds the Service Agreement is a writings that speaks for itself.

4.      Denied. As explained in the response to Paragraph 2, the issue of the NIFL's proper submission of documentation is clearly a question of fact which cannot be decided by a Motion in Limine.

5.      Denied. To the extent the averments of Paragraph 5 purport to paraphrase or to interpret documentary information related to damages for the Bayou Beast, Southern Oregon Heat and the Mobile Seagulls, said averments are denied on the grounds the documentary information are writings that speaks for themselves.

6.      Denied. By the Defendant's own admission in Paragraph 6, there are clearly issues of fact with respect to the submissions made to RPC. For this reason and for the reasons described in the response to Paragraph 2, the Defendant's Motion in Limine must be denied and the issue of the number of teams making claims should be submitted to the finder of fact.

7.      Denied. As stated in the response to Paragraph 2 above, RPC fails to distinguish between payroll and workers' compensation coverage services, as the two are clearly distinguished

in the Service Agreement.  Information needed to process payroll is not related to information necessary to establish workers' compensation coverage, which, by RPC's stipulation to liability, it did not do.  It is the NIFL's position that thirteen (13) teams submitted necessary information to RPC for workers' compensation purposes.  This matter must be submitted to a fact finder since RPC disputes that the NIFL did this.

8.      Admitted in part.  Denied in part.  It is admitted the Service Agreement had an effective date of March 20, 2001, however, any provision of the Service Agreement and any alleged breach thereof by the NIFL is not capable of being raised by the Defendant because RPC  agreed to withdraw its counterclaim against the NIFL on March 28, 2006  pursuant to the parties' liability settlement.  Thereafter, RPC filed the stipulation dismissing the breach of contract counterclaim against the NIFL, which was approved by the Court on April 7, 2006.

9.      Denied.  To the extent the averments of Paragraph 9 purport to paraphrase or to interpret the contents of the Service Agreement, said averments are denied on the grounds the Service Agreement is a writing that speaks for itself..  By way of further, answer, the NIFL denies breaching the parties Service Agreement (which RPC acknowledges through its agreement to withdraw its counterclaim against the NIFL).  In addition, the NIFL avers RPC terminated the Service Agreement in bad faith in order to hide its fraud.

10.     Denied. Martin Herf, one of the Ohio Bureau of Workers' Compensation officials who met with RPC about coverage prior to the execution of the Service Agreement testified at deposition explaining that the employer must fill out an application containing the employer's name, address, payroll beginning date and a description of the nature of the work performed and pay either a minimum or estimated premium in order for an employee for considered for coverage under Ohio

Workers' Compensation Law .  Herf Deposition, Pg. 9-10.   A copy of the Herf Deposition is attached hereto, made a part hereof and labeled **Exhibit A**.   Furthermore, in order to have Ohio coverage, Mr. Herf testified the most important requirement for the employer and its employees is that the employees have sufficient jurisdictional contact with the state of Ohio.  Mr. Herf explained that this means the Ohio Bureau of Workers' Compensation covers only Ohio-based employees who are hired and work in Ohio.

11.    Denied.  It is denied the NIFL materially breached the Service Agreement, which RPC acknowledged by it agreement to withdraw its counterclaim against the NIFL.  To the contrary, RPC terminated the Service Agreement in bad faith to hide its own fraud and used a bogus excuse that the NIFL breached the Service Contract.  Therefore, RPC should not be entitled to any cut-off date and damages due the NIFL should be assessed for the entire 2001 NIFL season.

By way of further explanation, RPC engaged in a deliberate course of fraudulent conduct when it met with representatives from the Ohio Bureau Workers' Compensation ("BWC") who specifically and directly instructed RPC that coverage was not possible for NIFL employees because none worked in the state of Ohio.  RPC never told the NIFL about this March 15, 2001 meeting. At the March 15, 2001 meeting, Daniel D'Alio told the Ohio BWC that all of the teams and players would remain in different states but the NIFL had plans to establish a corporate office in Ohio. Blateri Deposition, page 20.  The Blateri Deposition is attached hereto, made a part hereof and labeled **Exhibit B** .  (The NIFL was in the process of establishing an address in Ohio at the time of the March 15, 2001 meeting.  The Service Agreement lists the NIFL's address as a post office box in Warren, Ohio.)   Based upon this information conveyed to Mr. Blateri of the Ohio BWC by Dan D'Alio at the March 15, 2001 meeting, Mr. Blateri concluded the Bureau did not see any possibility

of granting coverage to any NIFL players through RPC acting as the PEO (since all players and teams were located and conducted its games outside the state of Ohio) and specifically explained this to Mr. D'Alio.  Blateri Deposition, Page 20; Page 30; Page 36 (**Exhibit B**).  Ohio would not grant coverage for out-of-state players and staff even if the NIFL moved its headquarters to Ohio.  Even though RPC received this information on March 15, 2001, it never told the NIFL about the results of this meeting and entered into the Service Agreement within two (2) weeks thereafter with the NIFL despite knowing that coverage was not possible in Ohio for any players or staff.

When RPC realized it could no longer perpetuate its fraudulent scheme, RPC terminated the Service Agreement with basically no notice and with no explanation to the NIFL that Ohio workers' compensation insurance did not cover players and staff.  As evidence of the perpetration of the fraud, on Friday, April 13, 2001, RPC sent instructions to the NIFL to clarify the policies and procedures required for workers' compensation coverage including the necessity of completing certain documents for the Ohio BWC, such as form C-110 (which form does not create coverage even when completed, but rather selects Ohio as the jurisdiction for workers' compensation if you are otherwise eligible).   RPC's April 13, 2001 letter is attached hereto, made a part hereof and labeled **Exhibit C.**

Acting in good faith, the NIFL had already submitted substantially all of the paperwork requested by RPC at the time of termination.  Carolyn Shiver testified the team's sent all requested player paperwork to RPC by the time payroll started.  Shiver Deposition, Page 78. Referenced portions of Ms. Shiver's deposition is attached hereto, made a part hereof and labeled **Exhibit D.** Ms. Shiver also testified that the NIFL made all required payments to the NIFL.  Shiver Deposition, Page 98-102 (**Exhibit D**). Inexplicably,  RPC terminated the contract with the NIFL on Tuesday, on

April 17, 2001, effective April 13, 2001.  This was done by RPC notwithstanding it had sent the

correspondence to the NIFL on April 13, 2001 and had talked to the NIFL days before making no

mention of any problems.  RPC's April 17, 2001 letter is attached hereto, made a part hereof and

labeled **Exhibit E.**

RPC's April 17, 2001 termination letter served to continue to perpetuate its fraudulent

scheme.  The letter was sent in a vain attempt to cover up RPC's fraud and attempt to place false

blame on the NIFL.  The letter continued to mislead the NIFL in the following respects:

1.      the letter did not disclose RPC's knowledge gained in the March 15, 2001
        meeting that coverage did not exist for any NIFL players ( Shiver Deposition,
        139, **Exhibit D**);
2.      the letter failed to clarify that the NIFL should not rely upon RPC's
        representations contained in the Proposal and in the Service Agreement
        regarding workers' compensation, as those representations were false ( Id..);

3.      the letter did not instruct the NIFL to look elsewhere outside of Ohio
        Workers' Compensation system for valid workers' compensation coverage
        for its players;
4.      the letter did not explain that the Certificate of Premium Payment evidencing
        the NIFL's premium payments to the Ohio BWC for the dates of March 30,
        2001 through May 14, 2001, did not mean coverage existed through the Ohio
        BWC for the NIFL's players, all of whom did not work or play in the state of
        Ohio. Shiver Deposition, 102, 139 (**Exhibit D** ); A true and correct copy of
        the March 30, 2001 through May 14, 2001 Certificate of Premium Payment
        is attached hereto, made a part hereof and labeled **Exhibit F**.
5.      The letter never mentioned the NIFL was removed from RPC's Ohio policy
        and/or workers' compensation through RPC's policy had been terminated via
        the cancellation of the Service Agreement.

As a result of RPC's cancellation of the Service Agreement and undisputed fact that  RPC

did not disclose the truth to the NIFL, the NIFL tried to obtain its own policy at RPC's direction

through the Ohio BWC without RPC's involvement and obtain a Certificate of Premium Payment

in its name, all of which the NIFL specifically did  because of RPC's instructions.[1]   Shortly after

RPC terminated the agreement, the NIFL spoke directly with the Ohio BWC about uninterrupted

coverage (which coverage the NIFL believed had existed already for all players - even out-of-state

players- through RPC's Ohio policy) for the remainder of the season beginning on May 14, 2001

when the first Certificate of Premium Payment would expire.   Shiver Deposition, 96-97 (**Exhibit

D**).   The Ohio BWC told the NIFL to submit new documents directly to the Ohio BWC since RPC

walked away from being the NIFL's PEO.   Shiver Deposition, 103-05 (**Exhibit D**).  The NIFL paid

an Ohio BWC premium invoice directly and then received a new Certificate of Premium Payment

evidencing payment through August 31, 2001, which the NIFL believed extended coverage through

RPC's policy for the remainder of the NIFL season for all players.   Shiver Deposition, 96-97, 104-05

(**Exhibit D**); A true and correct copy of the March 30, 2001 through August 31, 2001 Certificate of

Premium Payment is attached hereto, made a part hereof and labeled **Exhibit G**.  The NIFL believed

coverage existed under Ohio Workers' Compensation System for all players and staff until June 9,

2001 when the NIFL received a letter dated June 7, 2001 from the Ohio BWC  instructing the NIFL

that coverage did not exist for any NIFL players because no players (or teams) were located or played

in the state of Ohio – which fact RPC had known and withheld since at least March 15, 2001.  Shiver

Deposition, 104-05 (**Exhibit D**).  Had RPC been forthright with the NIFL as early as April 17, 2001,

---

[1]Dan D'Alio testified at deposition that he explained to Carolyn Shiver, shortly after NIFL entered into the Service Agreement, that RPC was going to report all wages paid to NIFL employees under RPC's policy with the state of Ohio for workers' compensation purposes and directed her at that time to establish a policy in the NIFL's name with the state of Ohio.  Mr. D'Alio explained that if the NIFL was no longer under RPC's policy, the NIFL could report payroll under its own policy with state of Ohio for workers' compensation coverage.  D'Alio Deposition, Pages 139-40. Mr. D'Alio indicated that Ohio requires  two policies written (one in the name of RPC and one in the name of the NIFL) when a Professional Employer Organization like RPC attempts to include a client like the NIFL under RPC's Ohio policy.  D'Alio Deposition, Pages 132-34.  Excepts from the D'Alio Deposition are attached hereto, made a part hereof and labeled **Exhibit H**.

the NIFL would not have wasted time in attempting to establish its own policy with the Ohio BWC for its players, none of whom played or worked in the state of Ohio.

By approximately June 7, 2001, when the Ohio BWC sent its letter to the NIFL, the 2001 season was almost over and the NIFL could not find another insurance company in time to provide workers' compensation for the NIFL players because the season had less than six (6) weeks remaining.  It took the NIFL six (6) months in the initial process to obtain the coverage it thought it had under RPC's Ohio policy.  <u>Shiver Deposition</u>, 105-07 (**Exhibit D**).  If RPC had told the NIFL about the results of the March 15, 2001 meeting on or about April 17, 2001, the NIFL undoubtedly would not have spent a month and a half in futility re-assembling paperwork and trying to attempt to continue coverage through Ohio and could have searched elsewhere for workers' compensation coverage that would have insured all NIFL players.  Especially for the this reason, damages should be for entire season.

Indeed, D'Alio and RPC hid  information while the NIFL relied upon RPC's representations that coverage existed in Ohio for its players.  RPC knew from the meeting with the Ohio BWC representatives that only those employees working in Ohio were covered under Ohio workers' compensation and failed to explain to the NIFL that workers' compensation coverage applied only to those employees working in Ohio and did not apply to the NIFL's players and staff, all of whom neither lived, worked or played in Ohio.  RPC's assurances coupled with its failures to explain the true status of the NIFL's coverage gave the NIFL a false sense of security.  The Ohio BWC found there was no nexus between Ohio and the NIFL's players.  The required nexus would not have existed even if the League headquarters moved to Ohio.

The NIFL avers RPC terminated its agreement with the NIFL in bad faith because RPC caused the NIFL to rely on its expertise, RPC knew it could not perform as promised, and then RPC abruptly pulled out of the agreement when it could no longer sustain the illusion of workers' compensation coverage through the state of Ohio for the players and staff.  In RPC's termination letter, RPC did not even instruct the NIFL to find other coverage outside the state of Ohio because Ohio's jurisdictional coverage rules excluded all NIFL players from coverage.  Dan D'Alio and RPC then tried to cover up their error and fraud by terminating the Service Agreement and blaming it on the NIFL.  RPC should not be entitled to benefit from its termination of the Service Agreement because it acted in bad faith. RPC's fraudulent acts, as described herein, have already been established and settled by the parties' according to the Stipulation as to Liability of March 28, 2006. As a result of RPC's liability stipulation as breach of contract, the NIFL's damages should be the full amount of unpaid player medical bills from the beginning of the 2001 NIFL season through the end of the 2001 season.

12.    Denied.  For the reasons outlined in the response contained in Paragraph 11, all of which reasons are incorporated herein, RPC terminated the Service Agreement in bad faith to hide its own fraud and deception. Furthermore, RPC never advised the NIFL it did not have workers' compensation and, therefore, never terminated its obligation to provide coverage.  Accordingly, RPC should not receive the benefit of its bad faith conduct by the Court imposing a damage cut-off date of May 17, 2001.   Damages should be for the entire 2001 NIFL season.

13.    Denied.  To the extent RPC attempts to interpret or paraphrase Plaintiff's Exhibit 12, RPC's allegation is denied because Plaintiff's Exhibit 12 is a writing which speaks for itself.  By way of further answer and as explained in the response to Paragraph 11, Dan D'Alio explained to Carolyn

Shiver that coverage would exist through RPC's Ohio policy for all NIFL players and staff until such time as RPC no longer served as the NIFL's PEO and, as a result, the NIFL applied for a secondary policy in its name as required by Ohio law at the time the NIFL entered into its relationship with RPC for use if and when RPC no longer acted as its PEO.  When RPC terminated the Service Agreement, the NIFL requested thirty (30) days to begin the process of providing information to the Ohio BWC to trigger the policy in the NIFL's name and obtain a new Certificate of Premium Payment.  However, as explained in greater detail in the response to Paragraph 11, RPC never told the NIFL, even at the time of RPC's bad-faith termination of the Service Agreement, that the players and staff, all of whom lived and worked in states outside of Ohio, were not eligible for coverage under Ohio workers' compensation law due to their lack of jurisdictional contacts.  RPC knew coverage could not exist but continued its fraud by never telling the NIFL that it could not provide workers' compensation insurance as RPC contracted to do.  Under these circumstances, RPC should not be permitted to benefit from its fraudulent actions by the Court imposing a damage cut-off date of May 17, 2001.

14.     Denied.  For the reasons explained in the response to Paragraphs 11 and 13, the damages cut-off date should not be April 17, 2001 or May 17, 2001.  To the contrary, because of RPC's actions, the damage cut-off date should be for the entire 2001 NIFL season.

15.     Denied.  To the extent the averments of Paragraph 15 purport to paraphrase or to interpret the contents of Paragraph 14 of the Service Agreement, said averments are denied on the grounds the Service Agreement is a writing that speaks for itself.  By way of further answer, Paragraph 14, does not apply to limit the damages sought by the NIFL for the reasons explained in the response to Paragraph 16 below.

16.     Denied.  For the same reasons in which the NIFL is prejudiced by the raising of the deductible now for the first time before the Court, the NIFL is also prejudiced by RPC's raising of Paragraph 14 of the Service Agreement now for the first time before the Court.  RPC never raised Paragraph 14 in any other pleadings and, in particular, did not plead Paragraph 14 as part of its affirmative defenses.  As explained in the NIFL's Brief in Support of Motions in Limine with Respect to Damages, which is incorporated herein by reference, damage limitations, such as the application of Paragraph 14 as raised by the Defendant in this case, must be pled as part of the Defendants' Affirmative Defenses.  Blue Sky MLS, Inc. v. RSG Systems, LLC, 2002 WL 1065873 (D. N.J. 2002) (the court considered the validity and applicability of a contractual provision limiting damages to less than $50,000.00, which was pled as part of the Affirmative Defenses).  A defendant's failure to raise an affirmative defense in a responsive pleading or appropriate motion generally results in the waiver of that defense.  Charpentier v. Godsil, 937 F.2d 859, 863 (3d Cir.1991).  Although a responsive pleading may be amended at any time by leave of court to include an affirmative defense pursuant to Fed.R.Civ.P. 15(a), the Third Circuit has held that when the opposing party is prejudiced, leave to amend is not allowed and the defense is waived.  Id. at 864.

In the instant matter, it is too late to amend any pleadings because the issue of liability has been resolved in favor of the NIFL and the case is near conclusion.  Furthermore, the NIFL is prejudiced by RPC's raising of Paragraph 14 now because the NIFL has not been given an opportunity to conduct discovery with respect to Paragraph 14.  Discovery is especially needed in respect of the interpretation of Paragraph 14.     See, Hullett at 111, infra. (holding that the determination as to whether the language of an agreement is unambiguous may not be possible

without examining the context in which the agreement arose).  For these reasons, RPC's Motion in Limine with respect to Paragraph 14 should be denied.

Alternatively, even if RPC is permitted to argue for the application of Paragraph 14, the only reasonable and correct interpretation of Paragraph 14 of the Service Agreement indicates that Paragraph 14 does not apply to limit the NIFL's damages in a case such as this.  The interpretation of Paragraph 14 is guided by the principals of contract interpretation.

When interpreting a contract, the primary function of the Court is to ascertain the intention of the parties. <u>Coca-Cola Bottling Co. of Shreveport, Inc. v. Coca-Cola Co.</u>, 769 F.Supp. 671 (D.Del.,1991) <u>quoting</u> 4 Williston on Contracts § 601 at 303-05.   The Court should give effect to the mutual intention of the parties at the time the contract is executed.  But it must be remembered that contract terms <u>are strictly construed against their drafter.</u>  <u>Bouton v. Litton Indus., Inc.</u>, 423 F.2d 643, 647 (3rd Cir.1970). The Court should put itself in the position of the parties, looking forward from the time they entered into the contract.  The Court should not view the contract from a position of hindsight. <u>Id. quoting</u> 4 Williston on Contracts § 607.  "Judicial construction of a contract requires a determination of the meaning of the language used, not the ascertainment of some possible but unexpressed intent of the parties." <u>Id. quoting</u> § 600A at 287 (<u>quoting</u> <u>Hunt v. Triplex Safety Glass Co. of North America</u>, 60 F.2d 92, 94 (6th Cir.1932)).

The Court should give the greatest weight to the express language of the contract itself.  <u>Id. quoting</u> Restatement (Second) of Contracts § 203(b) at 93; see also <u>United States v. Armour & Co.</u>, 402 U.S. 673, 678, 91 S.Ct. 1752, 1755-56, 29 L.Ed.2d 256 (1971), as the words themselves are the best and most important evidence of the intention of the parties.  <u>Id. quoting</u> 4 Williston on Contracts § 610A at 514. The meaning of words is dependent upon their context, and the contract should be

interpreted as a whole. Id. quoting 4 Williston on Contracts § 618 at 710-11. An interpretation wherein the whole can be read so as to give significance to each part is preferred. Id. quoting Restatement (Second) of Contracts § 202(2) & comment d. Where possible, the meaning of a term should be consistent throughout the contract.

In examining a contract, the Court is to interpret the contracting parties' intent as objectively manifested by them and make a preliminary inquiry as to whether the contract is ambiguous. Hullett v. Towers, Perrin, Forster & Crosby, Inc., 38 F.3d 107, 111 (3d Cir.1994). A contract provision is considered ambiguous if it is susceptible to two reasonable alternative interpretations. Id. Furthermore, if the Court determines that the written terms of the contract are unambiguous, then the Court will interpret the contract as a matter of law.  Id.  If, however, the Court determines that the contract is ambiguous, then the interpretation of the contract is left to the fact finder to resolve the ambiguity in light of extrinsic evidence. Id.  In determining the intent of the contracting parties, the Third Circuit applies the "plain meaning rule" of interpretation of contracts, which assumes that the intent of the parties to an instrument is "embodied in the writing itself, and when the words are clear and unambiguous the intent is to be discovered only from the express language of the agreement." Hullett at 111, quoting County of Dauphin v. Fidelity & Deposit Co., 770 F.Supp. 248, 251 (M.D.Pa.), aff'd, 937 F.2d 596 (3d Cir.1991).

However, the Third Circuit recognizes that a "determination as to whether the language of an agreement is unambiguous may not be possible without examining the context in which the agreement arose." Hullett at 111.  Thus, in determining whether ambiguity exists, a court is not always confined to the four corners of the written document. Id.  The judge must consider not only the words of the contract, but also "the alternative meaning suggested by counsel, and the nature of

the objective evidence to be offered in support of that meaning." <u>Hullett</u> at 111, quoting <u>Mellon Bank, N.A. v. Aetna Business Credit, Inc.</u>, 619 F.2d 1001, 1011 (3d Cir.1980).

When a contract is ambiguous, the doctrine of ejusdem generis may be applied.  <u>See</u> <u>Harrison v. PPG Industries, Inc.</u>, 446 U.S. 578, 588, 100 S.Ct. 1889, 64 L.Ed.2d 525 (1980) ("The rule of ejusdem generis, while firmly established, is only an instrumentality for ascertaining the correct meaning of words when there is uncertainty.") The doctrine provides that "contract language must be read in context, and general terms following an enumeration of specific terms should be construed with reference to specific terms." <u>Royal Ins. Co. (U.K.) Ltd. v. Ideal Mut. Ins. Co.</u>, 649 F.Supp. 130, 135 (E.D.Pa.), aff'd, 806 F.2d 254 (3d Cir.1986).

Applying the rules of interpretation to the instant matter, the Court must first look to the language of the contract and interpret the contract as a whole, while keeping in mind that RPC drafted the Service Agreement and, therefore, it must be strictly construed against them.[2] Restatement (Second) of Contracts § 203(b) at 93; see also <u>United States v. Armour & Co.</u>, 402 U.S. 673, 678, 91 S.Ct. 1752, 1755-56, 29 L.Ed.2d 256 (1971);  4 Williston on Contracts § 610A at 514; Williston on Contracts § 618 at 710-11.  The first sentence of Paragraph 14 states no warranty is made "with respect to the performance by employees of services rendered to client as contemplated hereunder."  The meaning of the first sentence of Paragraph 14 is revealed by Paragraph 1 of the Service Agreement, which is essentially the <u>basis</u> of the Service Agreement.  Paragraph 1 of the Service Agreement explains RPC is furnishing to the NIFL staffing for all job function positions. Paragraph 1 states "RPC hereby agrees to furnish to Client, and Client hereby agrees to engage from

---

[2]Dan D'Alio, President of RPC, testified that RPC prepared the Service Agreement.  <u>D'Alio Deposition</u>, Pg. 99 (**Exhibit H**).

RPC, staffing for all Job Function Positions." When Paragraph 14 and Paragraph 1 are read together and in context of the entire Service Agreement, it can be seen that Paragraph 14 applies to only those services provided by players and staff to the NIFL through RPC as the *de facto* employer of those employees while acting as the Professional *Employer* Organization.[3]  This interpretation is also reasonable because RPC naturally desires not to make any warranty with respect to the NIFL's players and staff that are providing services to the NIFL through RPC for RPC's own protection from liability.   Obviously, RPC would not want to be liable for the actions of the *de facto* employees when providing services to the NIFL.

Given that Paragraph 1 <u>forms the basis</u> of the Service Agreement, that basis being the NIFL players and staff becoming employees of RPC - without which RPC cannot offer any of the workers' compensation or payroll services it promised, the second sentence of Paragraph 14 must also be interpreted in light of Paragraph 1.   The second sentence of Paragraph 14 states "[u]nder no circumstances shall RPC's total liability of any kind arising out of or related to this Agreement, (including but not limited to any warranty claims hereunder regardless of the form and regardless of whether any action or claim is based on contract, tort, strict liability or otherwise) exceed the total amount paid by client to RPC as services fees hereunder . . ."  Clearly, as a result of the stated basis of the Service Agreement contained in Paragraph 1, the second sentence of Paragraph 14 is only concerned about limiting RPC's damages should it be sued by the NIFL for any acts or omissions committed by a player or staff-member.  This certainly does not apply to an action filed by the NIFL

---

[3]To the extent the Court looks to the context of the formation of the Agreement as provided in <u>Hullett</u>, <u>supra</u>, to guide its interpretation of any ambiguity or uncertainty with this provision, Dan D'Alio testified he explained to Carolyn Shiver that RPC would be hiring the NIFL players and staff who then would be placed on RPC's Ohio workers' compensation policy.  <u>D'Alio Deposition</u>, Page 54 (**<u>Exhibit H</u>**).

related to RPC's failure to provide workers' compensation coverage as promised, which is not in any way related to RPC providing players and staff-members to the NIFL as a Professional Employer Organization. The second sentence of Paragraph 14 is contained therein to attempt to limit RPC's liability for the negligent actions of the *de facto* employees and not to limit RPC's failure to provide workers' compensation insurance as it contracted to do.

To the extent the Court may decide the second sentence of Paragraph 14 is ambiguous even when read in the larger context of the Service Agreement and Paragraph 1, the Court may apply the doctrine of ejusdem generis, which supports the NIFL's interpretation when applied. The doctrine requires the Court to focus on the <u>specific</u> language of the first sentence of Paragraph 14 where the Agreement states no warranty is made "with respect to the performance by employees of services rendered to client as contemplated hereunder." This <u>specific</u> language is followed by <u>general</u> language in the second sentence of Paragraph 14 concerning RPC's total liability. The doctrine provides that "contract language must be read in context, and general terms following an enumeration of specific terms should be construed with reference to specific terms." <u>Royal Ins. Co. (U.K.) Ltd. v. Ideal Mut. Ins. Co.</u>, 649 F.Supp. 130, 135 (E.D.Pa.), aff'd, 806 F.2d 254 (3d Cir.1986). Therefore, when the generic terms of the second sentence of Paragraph 14 are construed with reference to the specific terms of the first sentence of Paragraph 14, it can be seen that RPC's limitation on total liability is confined to liability only arising from employees (players and staff) providing services to the NIFL through RPC. Therefore, for this reason and the other reasons discussed above, RPC's Motion in Limine with respect to Paragraph 14 of the Service Agreement must be denied.

17.     Denied.  For the reasons outlined in the response to Paragraph 16, the NIFL is entitled to the full amount of damages, which are not reduced or limited in any fashion by Paragraph 14 of the Service Agreement.

WHEREFORE, Plaintiff, National Indoor Football League, respectfully requests this Court deny all the Defendant's Motions in Limine with Respect to the Plaintiff's Motion in Limine.

Respectfully submitted,


s/ Timothy C. Leventry
Timothy C. Leventry, LL.M
Attorney at Law

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **NATIONAL INDOOR FOOTBALL** | : | |
| **LEAGUE L.L.C.,** | : | **CIVIL DIVISION** |
| **Plaintiff** | : | **NO. CA 2 - 548** |
| | : | |
| **v.** | : | **TYPE OF PLEADING:** |
| | : | |
| | : | **Reply to the Defendant's Motions in** |
| **R.P.C. EMPLOYER SERVICES, INC.,** | : | **Limine with Respect to Plaintiff's Damages** |
| | : | |
| **Defendant.** | : | |

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the _____20th_____ day of _____Nov._____, 2006, a true and correct copy of the above-captioned **REPLY TO DEFENDANT'S  MOTIONS IN LIMINE WITH RESPECT TO THE PLAINTIFF'S DAMAGES** was served by First Class United States Mail, email and/or facsimile by postage prepaid, upon the following:

**Michael J. Seymour, Esq.**
**Feczko and Seymour**
**520 Grant Building**
**310 Grant Street**
**Pittsburgh, PA 15219**

**Bernard C. Caputo, Esq.**
**Fort Pitt Commons Building, Suite 260**
**445 Fort Pitt Boulevard**
**Pittsburgh, Pennsylvania 15219**

**LEVENTRY,  HASCHAK**
**& RODKEY, LLC**

**s/ Timothy C. Leventry_____**
**Timothy C. Leventry, LL.M.**

.