**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

---

| | | |
|---|---|---|
| **NATIONAL INDOOR FOOTBALL** | : | |
| **LEAGUE L.L.C.,** | : | **CIVIL DIVISION** |
| **Plaintiff** | : | **NO. CA 2 - 548** |
| | : | |
| **v.** | : | **TYPE OF PLEADING:** |
| | : | |
| | : | **Plaintiff's Exhibits to Reply** |
| | : | **to the Defendant's Motions in** |
| **R.P.C. EMPLOYER SERVICES, INC.,** | : | **Limine with Respect to Plaintiff's Damages** |
| | : | |
| **Defendant.** | : | **JURY TRIAL DEMANDED** |
| | : | |
| | : | |
| | : | **FILED ON BEHALF OF:** |
| | : | |
| | : | **Plaintiff** |
| | : | |
| | : | **COUNSEL FOR PLAINTIFF:** |
| | : | |
| | : | **TIMOTHY C. LEVENTRY, LL.M** |
| | : | **LEVENTRY, HASCHAK** |
| | : | **& RODKEY, LLC** |
| | : | **1397 EISENHOWER BOULEVARD** |
| | : | **RICHLAND SQUARE III, SUITE 202** |
| | : | **JOHNSTOWN, PA 15904** |
| | : | **(814) 266-1799** |

# PLAINTIFF'S EXHIBITS TO REPLY TO THE DEFENDANT'S MOTIONS IN LIMINE WITH RESPECT TO PLAINTIFF'S DAMAGES

| | |
|---|---|
| HERF DEPOSITION EXCERPTS | A |
| BLATERI DEPOSITION EXCERPTS | B |
| APRIL 13, 2001 LETTER | C |
| SHIVER DEPOSITION EXCERPTS | D |
| APRIL 17, 2001 LETTER | E |
| CERTIFICATE OF PREMIUM PAYMENT - MARCH 30, 2001 THROUGH MAY 14, 2001 | F |
| CERTIFICATE OF PREMIUM PAYMENT - MARCH 30, 2001 THROUGH AUGUST 31, 2001 | G |
| D'ALIO DEPOSITION EXCERPTS | H |

responsible for handling the adjustments to accounts; things like that.

Q. Did he work under you?

A. Yes. He worked for a director under me.

Q. He wasn't directly under you; there was another person between you and him?

A. Yes.

Q. And who would that person have been?

A. Al Monahan.

Q. Now, if a company wants to obtain workers' compensation insurance through the Bureau, and for purposes of this deposition we refer to the Ohio Bureau of Workers' Compensation as the Bureau, what would they do if they wanted to obtain coverage?

A. Fill out an application. Pay a -- either a minimum or an estimated premium, and establish coverage.

Q. What type of information would be required from the employer for the Bureau to determine whether coverage would be available?

A. You know, I would probably refer you to the Bureau's application form, would be the easiest way to get all the specifics of that. In fact, I

EXHIBIT
tabbies
A

can give you a very general term. But if you wanted the specifics, that's the best thing to do would be to get a copy of the application.

Q. Let's for purposes of today, generally what would be required of the employer?

A. You know, basic name, address, when your company began doing business in the state of Ohio. The nature of your company so we can properly determine the appropriate manual classification to determine premium rates. A specific date on when you began payroll, because you can begin, you know, at any time. Typically, then, a signature of an officer of the company. What name; address. If you're doing business as a dba. That would be the general type of information.

Q. Would there be questions on there about where the workers reside?

A. I don't recall. There may be. I just don't recall.

Q. Now, when a person submits that application, do they pay a premium of some type before there's even a determination of coverage?

A. Typically, you would do one of two things. You'll either pay $10 to initiate to

exact date, but I'll try to get a month. And on my best recollection, that sometime in March of 2001 I attended a meeting that was requested by Jere Pasternack of PRM, the third-party administrator representing R.P.C. And Mr. Dan D'Alio, Al Monahan, from risk technical, and Kay Spicer from risk technical.

Q. And where was that meeting at?

A. It was in Columbus at the William Green building.

Q. And could you tell us what -- First of all, did Mr. D'Alio request that meeting?

A. I do not know who exactly initiated the meeting. I'm sorry. It was either Mr. D'Alio or Ms. Pasternack.

Q. Would the Bureau have initiated that meeting?

A. It could be. It could have been.

Q. Okay. So there was a meeting here with those individuals that you testified about. Can you tell us what the basis of that meeting was?

A. The basis of the meeting was to discuss the type of relationship that was being considered between the PEO and the National Indoor Football



League.

Q. And could you tell us here today what was your understanding of that relationship?

A. The relationship that I remember being described to me was that the National Indoor Football League was a rather new football league, indoor football league, of course, that would be coming and playing in different parts of the United States. But they requested our opinion on the jurisdictional issue with the type of relationship if the PEO would and/or could cover their -- the players and league personnel through the PEO located in Ohio.

Q. Okay. Let me just ask you a couple of specific questions about your understanding.

A. Okay.

Q. Was it your understanding that the teams that made up the NIFL would not play their games in the state of Ohio?

A. At the meeting that was not finalized, I would say. There was still some questions after the meeting of if there was anything going to be played in the state of Ohio.

Q. At the time of the meeting, what was



the -- your understanding about the headquarters for the league?

A. The headquarters was currently located in Louisiana. And that they, they being the PEO and the National Indoor Football League, had worked out some type of arrangement to relocate the league headquarters to Ohio.

Q. Okay. Based on the understanding that you had at that meeting, could you tell us today what Dan D'Alio and Ms. Pasternack were advised by you and the other members from the Bureau?

A. Sure. At the meeting I can -- it was conveyed to Jere Pasternack and Mr. D'Alio that if the -- if the teams did not locate -- were not located in the state of Ohio, if they did not operate in the state of Ohio, then --

Q. You mean the teams?

A. The teams. The teams did not operate in the state of Ohio, we did not see any possibility of Ohio granting coverage to the National Indoor Football League through the PEO.

Q. Okay. Mr. Blateri, what was the date of your meeting?

A. I do not know that. I do not know the



exact date.

Q. If I showed you actually what's Exhibit 3 to Mr. Herf's deposition, which is some -- a print-out of some e-mails --

A. Okay.

Q. -- would this refresh your memory? And I think these go in reverse order.

A. Yes. The first one?

Q. I think the first entry is down at the bottom of the first page.

A. Oh, okay. This is a separate, I take it, because this is Page 1. It says March 16th. Yesterday. Okay. I was looking for some type of word, some type of notice. So it appears that it was March -- March 15th, 2001. Because I'm quoting as yesterday, and the e-mail is dated March 16th.

Q. So this e-mail that you're referring to on this exhibit, is this an e-mail from you?

A. Yes.

Q. And it's dated March 16th, 2001, at 9:50 a.m.

A. Yes.

Q. And you sent it to Tom Sico.

A. Sico, yes.

EXHIBIT B

Q. You tell me, again, what you advised them.
A. Yeah. Sure. I gave an informal or unofficial observation based on the high level scenario that they gave me, Al Monahan and Kay Spicer, that it did not appear that this would fall under the Bureau's jurisdiction to provide coverage. And that basically caused the e-mail to our law department that we left it as we will get an official word from our law department.
Q. So after March 15th, did any facts actually -- did any facts change from what you were told by Mr. D'Alio or Ms. Pasternack at your meeting?
A. Actually, no, it did not. Everything -- I'm trying to think. For the most part how they described the relationship and how the National Indoor Football League would operate, there was no drastic change in what was told to us at the meeting.
Q. Okay. So you have a meeting on March 15th. There's some internal e-mails regarding this matter. The Bureau receives on March 30th the application from the NIFL. And a certificate is



issued. You don't know the exact date, but it's showing coverage from 3-30-2001 through 5-14-2001.
A. Yes.
Q. Would the application -- Let me just rephrase that. When the application comes into the Bureau, who does it go to specifically?
A. The application is directed to the cash control unit.
Q. Cash?
A. Cash control. It's a unit that establishes and assigns an application number and basically processes the $10 payment or any kind of payment that's accompanying the application.
Q. Okay. And then after that department, where does the application then go?
A. The application would then go to -- I'm trying to think. We had some name changes of our department, so excuse me. It would go to the risk processing department, which is now we refer to as our policy services department, and where the application would be processed there. And when I mean process, they would enter the demographic information into the system. They would calculate a premium security deposit billing. They would assign



the NCCI manual classifications pertaining to their operation.
Q. Would they assign a policy number?
A. And once the process is complete, the system would automatically generate a policy number. Yes. So, yes, the policy number would be assigned then.
Q. So at any time through this process you just described, would your department have seen the application and known this application had even come in?
A. No.
Q. Okay. To the best of your recollection and/or records, when did you learn that the NIFL had actually applied for coverage?
A. I think upon -- You know, I do not know the exact date. I could not tell you the exact date when I was personally notified of the account being established for the National Indoor Football League.
Q. Based on your records, do you -- what appears to be the date you have first records of this?
A. It was not soon -- or it was soon after the account was established.



Q. Would -- So I'm clear on that, do you mean after the certificate of insurance would have been issued?
A. Yes.
Q. Okay. And was it after that, then, that you continued with this investigation, and you testified to that led up to Tom Sico's letter, dated June 4th?
A. Yes. Yes.
Q. Okay. And do you have -- You mentioned in your earlier testimony that you had a phone call to Carolyn Shiver. Did you make that call?
A. No. I was in the office of Marty Herf, the chief risk officer, upon his request. Marty initiated the phone call. I was asked to explain the situation to Ms. Shiver and explain, based on the type of relationship and what the Bureau thought that our legal opinion would be.
Q. And could you tell us when that phone call, to the best of your knowledge, would have taken place?
A. I'm sure with going through even more e-mails -- I do not know the exact date of that phone call. I'm sure I can find something, but at

this time I do not know the exact date of that phone call.
Q. We'll ask you, because part of our notice of deposition was to supply file documents. I'm going to ask you to follow-up on that.
But in relationship, however, to your meeting, your face-to-face meeting with Mr. D'Alio and Ms. Pasternack, could you estimate how long it was after that meeting that the phone call took place to Carolyn Shiver?
A. At this time I could not guess as to the time.
Q. Okay. I don't want you to guess.
During that same time frame that the call was made to Carolyn Shiver, were there any other phone calls made with Marty Herf's involvement?
A. Not that I know of. At this time I can only think of the phone call to Ms. Shiver. That's the only one that Marty directly participated in.
Q. In your presence?
A. In my presence, yes.
Q. To be specific, you were not involved -- you were not present with Marty Herf if, in fact, he made a phone call to Dan D'Alio?



A. If that happened, no, I was not in the presence.
Q. Okay. And you were also not present for a phone call made by Mr. Herf to Ms. Pasternack?
A. No.
Q. Okay. All right.
A. To my recollection, to the best of my recollection, no.
Q. Who is Jerelyn Pasternack in relationship to the Bureau?
A. Jerelyn Pasternack works for a third-party administrator, which represents employers' interests and assists in risk and claims and/or claims management issues, and deals with the Bureau of Workers' Compensation.
Q. It's my understanding from a proposal made by R.P.C., that R.P.C. was anticipating retaining Professional Risk Management, Jerelyn Pasternack's company, to do the risk management for the NIFL. Does that -- Would that be a proper relationship there?
A. That would sound accurate, yes.
Q. Okay. Just so I'm clear on your testimony regarding this coverage issue, if the NIFL



had moved its headquarters and all its corporate employees to Ohio, and those corporate employees who worked in the headquarters all lived and worked here, first of all, would those employees that worked in the corporate headquarters have been covered by the workers' compensation certificate issued by the Bureau?
MR. SEYMOUR: Objection to form.
THE WITNESS: Yes.
BY MR. LEVENTRY:
Q. Okay. Assuming that the -- again, the headquarters and the employees were moved to the state of Ohio, would the players for the 18 teams, none of which were in the state of Ohio and none of which played games in the state of Ohio, been covered by the Bureau of Workers' Compensation coverage?
MR. SEYMOUR: Objection to form.
THE WITNESS: No.
BY MR. LEVENTRY:
Q. And did you, in fact, inform Mr. D'Alio and Ms. Pasternack of that position with the Bureau on March 15th, 2001?
MR. SEYMOUR: Objection to form.



THE WITNESS: Officially, no. We gave an unofficial, based on what was given to us.
BY MR. LEVENTRY:
Q. So the meeting that took place on or about March 15th, was an information -- was it an informational meeting to discuss coverage?
A. Yes. Basically, it was throwing out a scenario. And that's why we needed time to gather additional facts so that we could provide that to our law department.
Q. And, in fact, as of the date of that meeting, the Bureau had not received an application yet for coverage. Is that correct?
A. That would be correct, based on the dates of the application, the date of the application receipt, yes.
MR. LEVENTRY: I have no other questions.
MR. SEYMOUR: Just a few.

- - -

EXAMINATION

BY MR. SEYMOUR:
Q. Mr. Blateri, my name is Mike Seymour. And I represent the defendants in this matter with regard to a certain count in the complaint. So I




RPC Employer Services, Inc.
6824 Big Beaver Boulevard
P.O. Box 350
Beaver Falls, PA 15010-0350
Tel: (724) 843-3020
Toll Free: 1-800-635-9961
Fax: (724) 384-3071
www.employshare.com

April 13, 2001

Certified Mail & Facsimile

National Indoor Football League
Attn: Carolyn Shiver
600 Loire Ave
Lafayette, LA 70507

RE: Policies and Procedures – Applications and Workers Compensation
EFFECTIVE IMMEDIATELY

Dear Ms. Shiver:

This letter shall serve as confirmation to inform the National Indoor Football League and all participating teams of the following policies and procedures RPC Employer Services, Inc. must put into place due to the restrictions placed by the workers' compensation carrier. This will help eliminate the miscommunication and confusion between the teams, the NIFL office and RPC.

1) All new player applications, fully and correctly completed (sample enclosed) including two forms of acceptable I-9 identification documents, must be received into our office no later than the prior Wednesday of weekend in which the player is utilized. The C110, the workers' compensation contract, must be filed with the State of Ohio before the employee/player is utilized in order for the employee/player to be covered.

   **PLEASE NOTE: NO player will be considered an employee/player and therefore entered into our system, which means that paychecks will not be issued nor workers compensation coverage be in place (no liability will be assumed by RPC Employer Services, Inc.) until all paperwork is completed correctly, received in our office and filed with the State of Ohio.**

2) A Release form must be signed and received by noon, Monday of the payroll week in order for an employee/player to be terminated in our system, otherwise a management fee will be charged for each player that is active in our system.

   All injured players must remain active and a management fee will be charged to the appropriate team.

EXHIBIT
C

3) No payroll checks will be sent until wired funds are verified thru the NIFL National City account. You can fax to RPC Employer Services, Inc. a copy of the wire verification to expedite the procedure.

4) Workers compensation accident reports must be fully completed and legible including a description of the injury/accident. return date or estimated return date and address and phone number of the medical treatment provider. The accident report must be faxed to the NIFL first and will be forward to our service provider Professional Risk Management. All treatment must be approved by CRA for coverage:

CRA Managed Care Inc.

614-854-9305

All bills are the be forward to:

CRA Managed Care, Inc.
PO Box 261107
Columbus, OH 43226

614-854-9305 fax: 614-854-9307

A workers compensation contact must be provided to RPC Employer Services, Inc. by each team by Tuesday April 17, 2001. A workers' compensation packet will be mail to each team the week of April 16, 2001.

It is RPC's suggestion that each team appoints a person to be responsible for the application process and a person for the workers' compensation process in order for your team to have a smooth process. These responsible people may feel free to contact me with any questions or concerns.

**There will be no exceptions to the above polices and procedures.**

If you have any questions, please do not hesitate to contact me. I thank you for your cooperation with respect to these policies and procedures and insuring a prosperous and effective working relationship.

Sincerely,

Maureen A. Ciarolla
Director, Human Resource Operations

Q. Do you know as you sit here today of any teams that did not comply with that request, the third one?

A. I don't think any of them would have intentionally didn't.

Q. That wasn't my question.

A. Maybe they didn't get them right or something. I do remember one team that sent them in and they told them they got them and then the next week they called them up and said they are all wrong, you have to do them again. But I know they all sent them by their pay dates. I just don't --- I do remember, but I don't remember which team it was that we got a call and they sent them all wrong or something and they all had to be redone. So, I mean, we went through that learning curve, yes.

Q. When the teams did whatever it is that they did do, they did it direct with Dan's office



EXHIBIT
D

A. Yes.

Q. So it wasn't something that you called about then and said, hey, these are the wrong dates. We're actually running the league until August and, therefore, the coverage period shouldn't stop on May 14th?

A. No, we did call whenever R.P.C. pulled out and, you know, made sure our certificate was okay, but there actually came a bill that you had to pay. And then that went the next quarter, I believe. And probably another bill would have come for another quarter after that had we continued on. I don't know that, but I would guess. You know, in other words, they are covering you for their time period and not any longer.

Q. So to the best of your recollection, you believe that the document, Number 11, or the photocopy of Number 11 --- I don't

have the actual document representing Number 11, was something you received after R.P.C. pulled out?

A. Yes.

(Deposition Exhibit Number 12 marked for identification.)

BY ATTORNEY SEYMOUR:

Q. I show you a document that's been marked as Number 12. Have you seen Number 12 before this morning?

A. Yes.

Q. The document itself is --- at least I can't see a date on it, but it does refer to terminating our agreement effective April 13, 2001. Given that date that's within the body of it, do you have any recollection of when you received this?

A. Exact recollection, April 16th and it was FAXed.

Q. Did you understand the two

reasons that were set forth in this Number 12 for termination?

A. The reasons were easy to understand. I didn't agree with them and they weren't correct, but, I mean, it's self-explanatory, yes.

Q. Now, it states non-payment. What was your understanding of the non-payment that it referenced?

A. There could not have been a non-payment, because they were instructed that you do not send the checks to the team until the payment is made. So there's absolutely no way there was a non-payment. So I didn't really know what they meant by that, because you couldn't have paid the team without putting the money in the bank to transfer it or them getting the money in your hands. That was the rule of the whole thing. That way we didn't have to worry if a team remembered to do it. They simply didn't get

pay checks if they didn't remember to do it.

Q. Before receiving this on April 16, 2001, that is Number 12, had you received any communications that there was a non-payment issue?

A. Maureen had sent us on the 13th several things that we needed to finish, you know, to work on. You know, here's how we want to do things, like that earlier memo that she sent. And that was the only thing. I don't think non-payment was in there, because to my knowledge we didn't have a non-payment. We had one team that when this all happened, and I just came down on all the teams, one team said they mailed a check, overnighted, but that wouldn't have mattered, because R.P.C. would have had it before they mailed their checks to them. I don't think that there was a non-payment.

Q. Do you have any knowledge

about a check being returned for insufficient funds?

A. I don't remember that until after everything started happening. And I don't know who that was. I don't remember what team it was. But I know that our agreement with R.P.C. was everything went through that bank account we set up. And you don't mail the checks until the money comes to you. Then there's no sweat on that, on any issue. You know, that's exactly how we set them up.

Q. You believe that you did receive something from Maureen on the 13th; right?

A. I did receive something from Maureen on the 13th. And it was just a list of, here's what you need to do kind of thing.

Q. Is that something you have retained with your records?

A. Did you show me that today?

ATTORNEY LEVENTRY:

I may have that. I'd have to look.

A. I do have it, though. If he doesn't have it, I have it. It was kind of like, here's additional information we need to get.

BY ATTORNEY SEYMOUR:

Q. Now, the second reason set forth in Number 12 is noncompliance. What was your understanding of the noncompliance reason?

A. They never explained that. And I just always thought it had to do with maybe the additional things that we needed to do or additional information that they wanted to get from us.

Q. Do you know what the additional information concerned?

A. Well, on the 13th, like I said, there was a letter that Maureen sent.

Q. Now, upon receiving Number

12 by FAX, what did you do in response?

A. You can imagine I sent them a rather nasty letter. You know, I don't have that with me, but I do have a copy of it, just telling him that, number one, you don't terminate an agreement and send it on the 16th and say, by the way, we're backdating this three days. You know, and you don't terminate an agreement without just cause in my opinion. And I couldn't find any just cause.

Q. Well, what did you do about the issues regarding payroll and Workers' Compensation for the ten teams or 11 that were being handled through R.P.C.?

A. What did we do?

Q. Yes.

A. Well, I mean, here we were in the middle of a season of play. And we had a certificate from Ohio saying we were insured, so we went

ahead with the teams. And then, you know, now they are all in their individual state funds, a couple years later.

Q. So for the season, the '01 season, did you continue to rely upon the Ohio certificate for Workers' Compensation?

A. When we talked to our general liability insurance, they said, number one, R.P.C. can't cancel your insurance without a 30 day notice. And so they felt, go ahead, you're insured, because they can't cancel you without 30 days. And we also had the Ohio certificate. And it said we were insured.

Q. So your understanding was that you had 30 days, that would take you to May 16th, right?

A. Right.

Q. And after May 16th, then what did you rely on for Workers' Comp?

A. We had talked to Ohio and they just said get new C-110s under your name and send them in.
Q. Do you recall who at Ohio you spoke to?
A. No.
Q. And when you say we, of course, it may not have been you personally, is that why you're using we?
A. I did. It was me that talked to Ohio.
Q. Okay.
A. But, of course, I didn't go through this whole in detail of what was going on. I just said, you know, I have this certificate of insurance, are we insured?
Q. And you don't know who it was that you spoke to?
A. No, I don't. I'm sure that somewhere in my notes I wrote it down, but I don't remember who it was.
Q. So based on that

conversation, what was your understanding then in regard to Workers' Compensation?

A. That we moved forward. We were insured.

Q. Do you recall how long you continued to have that understanding?

A. Ohio sent us a letter maybe in June, I can't remember the date, that they wouldn't cover any out of state employees and we were all out of state employees.

Q. After you received that letter, what did you do about Workers' Compensation?

A. Well, our insurance company said you have a 30 day grace period on any insurance, so you have 30 days. By that time, our season was pretty much ended. So we --- by then, we were like, okay, you know, this is it. We've got to find a new company.

Q. Who's this insurance

company telling you this?
A. HRH is our general liability and they carry us through I think it's American Fidelity General or American General. They were our general liability carrier. And our thoughts were, okay, if we don't have Work Comp, then the next one back is your GL that's got to pick up these claims and we really need to talk to them right away and let them know what's going on. So we did keep HRH informed.
Q. Where is HRH located?
A. They are in Amarillo, Texas.
Q. Did you send HRH a copy of the letter that you received from Ohio in June?
A. I don't know what I gave them. I met them at the airport.
Q. What airport?
A. I don't remember. I guess Dallas. Now, I was on my way to traveling out west and they met me

at the airport. I think it was Dallas. We talked about this and I showed them a lot of paperwork, but I don't know that I left them anything.

Q. So through the balance of the '01 season, after receiving a letter from Ohio and your belief that you had continued Comp coverage for another 30 days, there was no other Workers' Compensation for that season?

A. And our season ended the last week of July, which would have taken us through that.

Q. Now, in the following season '02, how did you arrange the payrolls and the Workers' Compensation?

A. Everybody went to their state funds, so we didn't have any more problems.

Q. Now, in terms of total premiums paid for Workers' Compensation for the '01 season, do

that the --- that they were terminating the insurance with the Ohio Bureau of Workers' Compensation?

A. No, it isn't. In fact, this --- HRH felt that they weren't terminating the insurance.

Q. Did the last paragraph of that letter advise you that they were going to notify the Ohio Bureau of Workers' Compensation that they were terminating the agreement with you?

A. Yeah, it says they are going to notify Ohio Bureau of Workers' Compensation that they were no longer our employer firm.

Q. Is there anywhere in there that says that your certificate of insurance from the Bureau of Workers' Compensation of insurance was terminated?

A. No.

Q. Another question that I would ask you, is Mr. Seymour asked

Apr 17 01 01:24p p.12

EmployShare™

*Focus On The Business Of Your Business*

CERTIFIED MAIL/FACSIMILE

National Indoor Football League
Attn: Carolyn Shiver
League Office
600 Loire Ave
Lafayette, LA 70507

Ms. Shiver:

This letter will service as certification that RPC Employer Services, Inc. hereby is terminating our agreement effective April 13, 2001 for the reasons as follows:

Non-payment
Non-compliance

Please be advised that all agencies such as the Ohio Bureau of Workers' compensation, will be notified of this termination.

Yours truly,

Daniel D'Alio
President

CC: Bureau of Ohio Workers' Compensation
Professional Risk Management
CRA Managed Care

EXHIBIT
E

PO Box 8605, Warren, OH 44484
Phone: (800) 635-9961 Fax: (419) 821-0229
E-mail: ddalio@employshare.com

#12

TP-655

# STATE OF OHIO

## BUREAU OF WORKERS' COMPENSATION

COLUMBUS, OHIO 43215-2256

### CERTIFICATE OF PREMIUM PAYMENT

This certifies that the employer listed below has paid into the State Insurance Fund as required by law. Therefore, the employer is entitled to the rights and benefits of the fund for the period specified. For more information call 1-800-OHIOBWC.

THIS CERTIFICATE MUST BE CONSPICUOUSLY POSTED.

POLICY NO. AND EMPLOYER
1338423

PERIOD SPECIFIED BELOW
03/30/2001 THRU 05/14/2001

BWC

NATIONAL INDOOR FOOTBALL LEAGUE LLC
NIFL
PO BOX 8628
WARREN OH 44484-0628

James Conrad
ADMINISTRATOR

DP-22
BWC - 1622 (REV. 3/96)

002498333

THIS CERTIFICATE MAY BE REPRODUCED AS NEEDED

Certificate issued first.




EXHIBIT
F

tabbies

STATE OF OHIO

**BUREAU OF WORKERS' COMPENSATION**

COLUMBUS, OHIO 43215-2256

CERTIFICATE OF PREMIUM PAYMENT

This certifies that the employer listed below has paid into the State Insurance Fund as required by law. Therefore, the employer is entitled to the rights and benefits of the fund for the period specified. For more information call 1-800-OHIOBWC.

THIS CERTIFICATE MUST BE CONSPICUOUSLY POSTED.

| POLICY NO. AND EMPLOYER | PERIOD SPECIFIED BELOW |
| --- | --- |
| 1338423 | 03/30/2001 THRU 08/31/2001 |

NATIONAL INDOOR FOOTBALL LEAGUE LLC
NIFL
PO BOX 8628
WARREN OH 44484-0628

BWC

DP-22
BWC - 1622 (REV. 3/95)

James Conrad
ADMINISTRATOR

THIS CERTIFICATE MAY BE REPRODUCED AS NEEDED

Certificate issued second




EXHIBIT
G
tabbies

just allowed to speak. It was Carolyn's meeting with I believe prospective teams. So I mean I was given ten minutes, Richard and I.

Q. So you went to Louisiana and did you explain what you could offer?

A. We explained what the Employee Leasing Services were.

Q. And what did you explain to the teams as well as the NIFL people that were there about providing Workers' Compensation insurance?

A. We didn't say anything about providing Workers' Compensation insurance. We discussed hiring the employees and that the employees would be coming onto our Ohio policy and that's the only way that we could cover any of our employees. We also discussed the ---.

Q. Let me just clarify this record. They'd be coming onto your Ohio Workers' Compensation policy?

A. As Ohio employees.

Q. And what did you explain at



EXHIBIT

H

entered into on or about March 20th, 2001; is that correct?

A. Yes.

Q. And was this agreement drafted by the RPC? Your office prepared this agreement?

A. Yes.

Q. Or was this prepared by a third party on your behalf?

A. No.

Q. And were the fees negotiated? The exhibit that's attached to the agreement has fees on it, were they negotiated with the NIFL?

A. With Carolyn Shiver.

Q. And did you do those negotiations?

A. Yes.

Q. And we had already asked you the question to read the fees for Workers' Compensation coverage and you've already answered that. Were these fees comparable to fees that RPC charges to other clients?

A. Yes. Yes, comparable.

and the policy that the NIFL had would then take over. So when we cancelled our agreement with them we had no idea that they did not have coverage.

Q. What would have even ---?

A. We assumed that they did have coverage.

Q. What would lead you to believe that they had coverage when you were the one providing the coverage and you cancelled it within 24-hour notice?

A. Because they had Ohio Workers' Compensation also?

Q. Who?

A. NIFL. They saw the certificate. I just read it to you.

Q. Why would the NIFL also have Workers' Compensation through the State of Ohio?

A. State requires it.

Q. So what you're saying is --- explain that to me so I understand why they required and how it would

have been done?

A. Well, I don't have the legislation in front of me, but my interpretation of why the client has to have coverage is they want to protect themselves from losing money. So therefore any client of a leasing company has to have its own policy also. My other clients in Ohio have their own policy still. We just don't report claims or revenue onto that policy. It remains dormant. If the client leaves me, then the client goes back to their old policy. It ensures that the client is never without coverage. It ensures that the state is not without an employer in compliance because it would be really easy to get lost in the shuffle if you leave a leasing company and don't get another policy. So the state's really concerned that they don't lose money. It also protects the leasing company from a client that blows up on them because

then the risk --- meaning lots of claims. Because then the risk would go back to the client so no one really loses, just the client has to shoulder that risk. And that's a --- so it's a mutually beneficial legislation for the client, the state and the leasing company.

Q. So is this obtained as coverage certificate for the NIFL, is that like a dual thing? Does it happen as a result of the efforts that you undertook with the State of Ohio or as a result of the efforts of the NIFL?

A. The NIFL --- what do you mean as the efforts?

Q. Well, in order for that certificate to be issued, who would have filed that paperwork?

A. Carolyn would have sent that in, the application requesting them. And I believe that's why they needed the P.O. Box which is to have an Ohio address until they moved. It didn't

A. RPC already had coverage. Our policy had been in effect since '96, same ID, same policy so it's not --- we didn't submit for coverage.

Q. Okay.

A. It's just the NIFL was a new employer.

Q. I guess what I'm trying to get at is, who would have told the NIFL that you have to submit an application to get your own certificate of premium payment?

A. I explained the --- I don't have the form here but I'm sure there's a copy somewhere. I explained the form to Carolyn and in a way of a benefit not to sell us out of a potential job. But I explained to her clearly that in Ohio, Ohio employers, all Ohio employers have to have Workers' Comp even if they lease their employees. This form, the one that she signed that I explained says that we're going to report all your wages under my policy. If you ever

leave us that means everything goes back to your policy. So you're never without, nor is the state without coverage, because the state wants to make sure they receive your money and can follow you.

Q. So this would have been done by the NIFL as part of the whole process of getting signed up with you?

A. Right. I do it with my other clients. All of my clients in Ohio have to do the same thing. And this is the application. Do you have these? You should have these. It discloses the relationship.

ATTORNEY CAPUTO:

That's the document that you said.

A. Right, right.

BY ATTORNEY LEVENTRY:

Q. Okay. So we under --- I think we both --- I at least now have a better understanding of this is that the --- this is done as a requirement