IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NATIONAL INDOOR FOOTBALL LEAGUE, L.L.C., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 02: 02cv0548 |
| R.P.C EMPLOYER SERVICES, INC., | ) ) | |
| Defendant. | ) | |

**MEMORANDUM ORDER OF COURT**

By Memorandum Opinion and Order of Court of February 1, 2007, the Court denied without prejudice, but essentially deferred, ruling on Defendant's First Motion in Limine which requested the Court to limit the damages of Plaintiff, the National Indoor Football League, L.L.C. ("NILF") to only ten (10) teams. (*Document 105-01*). The following constitutes the Court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52(a) on this sole issue:

1. Carolyn Shiver, President of the National Indoor Football League ("NIFL"), testified that during the 2001 football season the NIFL consisted of eighteen (18) football teams.

2. According to Ms. Shiver, the Service Agreement, which the parties entered into effective March 20, 2001, would cover all teams in the NIFL, with the exception of five (5) teams which were located in monopolistic states for the purpose of workers' compensation coverage, for a total of thirteen (13) teams. The effective starting date of the Service Agreement would be "[b]ased on each team's first game of the 2001 season according to the official published schedule. . . ." Service Agreement, Page 6.

3. By email dated March 16, 2001, Daniel D'Alio advised the NIFL that RPC's services, including workers' compensation, would not be active or in effect until the following conditions were met: (i) the League Service Agreement with RPC was completed and signed; (ii) first pay date was set and agreed upon by all teams; and (iii) employee applications were received by RPC, which must include the appropriate paperwork including the Ohio Form C-110.

4. Pursuant to the New Employee Packet, before a team and its players could be properly registered as employees of RPC, it was mandatory that the following forms be completed and returned to RPC: "Employee Status Box; Application for Employment; W-4 Employee's Withholding Allowance Certificate, I-9; Employment Eligibility verification; Photocopy of Social Security and Driver's License; Employment Agreement; Payroll Direct Deposit Authorization Form; Local Tax Form (if applicable); BWC Ohio Workers Compensation Form C-110; Emergency Notice Form; Occupational Privilege Tax Form (if application); and Statement of Policy."

5. On March 17, 2001, Ms. Shiver submitted the NIFL's Application for Coverage for workers' compensation. Nothing in the Application limits the number of teams which would be covered under this policy.

6. On March 22, 2001, the NIFL paid $10.00 to the State of Ohio Bureau of Workers' Compensation to open an account with the State of Ohio. Ms. Shiver testified that she was never told by RPC or the Ohio Bureau of Workers Compensation that there would be a limit on the number of teams covered by Ohio workers compensation.

7.      The NIFL contends that thirteen (13) teams submitted the requisite information to RPC for workers' compensation purposes.  RPC, however, responds that only ten (10) teams paid monies to RPC; that only these same ten (10) teams submitted completed documentation to RPC; and, therefore, the NIFL's claims should be limited to these ten (10) teams.  The three (3) teams in dispute are the Lousiana Bayou Beasts (a/k/a Monroe), the Mobile Seagulls, and the Southern Oregon Heat (a/k/a Medford).

8.      Specifically, RPC argues that none of the three disputed teams submitted payroll information prior to the termination of the Service Agreement and that the three disputed teams submitted incomplete C-110s.

9.      RPC alleges that by letter dated April 16, 2001, it terminated the Service Agreement for a material breach effective on April 17, 2001, or at the very latest, thirty days thereafter on May 17, 2001.

10.     Ms. Shiver testified that there was no requirement in the Service Agreement that any NIFL team would need to make any payment to RPC prior to submitting payroll.  In fact, on March 22, 2001, the NIFL paid RPC  $495.00 for "set up fees."  Ms. Shiver testified that this was RPC's fee to set the teams up, fill out the necessary paperwork, and get payroll set up.

11.     Paragraph 2a of the Service Agreement provides as follows:

> **PAYROLL REPORTING:** Commencing with the EFFECTIVE STARTING DATE, and according to the payroll processing frequency itemized on the FEE STRUCTURE STATEMENT page, the Client must report employee wages in a timely manner so as to allow RPC to process and distribute payroll and related benefits in accordance with Federal and State guidelines.  Should

> client fail to report wages each and every pay period, RPC shall reserve the right to immediately terminate this agreement pending payment in full of all obligations. Client shall be solely responsible for all wages and applicable taxes pertaining to unreported wages. if client requests to activate service with RPC in the future, then Client would be required to meet normal underwriting guidelines in order to initiate new service.

12. Paragraph 5(a) of the Service Agreement provides as follows:

> a. <u>Workers' Compensation Insurance</u>
>
> RPC shall furnish and keep in full force and effect at all times during the term of this Agreement workers' compensation insurance covering all Employees filing Job Function Positions under the terms of this Agreement, and where applicable, such policies shall designate Client and RPC respectively, as the first and second named insured. In addition, RPC shall cause that appropriate evidence of insurance be filed with the Worker's (sic) Compensation Bureau of any state as deemed necessary by the Client.

13. The NIFL concedes that it did not submit payroll information to RPC for the disputed teams; however, as Ms. Shiver explained, the reason there was no payroll for these teams was because the Service Agreement was terminated before the payroll information could be submitted to RPC.

14. Ms. Shiver testified that she told the NIFL teams that all the correct paperwork had to be completed or they would not be covered under the RPC Service Agreement. Further, in order to have workers' compensation coverage, each team had to run their payroll through RPC.

15. Ms. Shiver testified that each of the three disputed teams either had one or two bye-week(s) during the first four weeks of the 2001 season and thus, these teams would not have had payroll to submit.

16. Plaintiff's Exhibit 35 confirms the testimony of Ms. Shiver.  As reflected in Exhibit 35, the Louisiana Bayou Beasts had a game during Week 1 on March 30, 2001, but that team did not have another game until April 21, 2001 during Week Four of the season.  The Mobile Seagulls did not play during Week One of the season; but rather played its first game during Week Two on April 6.  The Southern Oregon Heat played its first game on March 28, 2001 during Week One; it did not play during Week Two; and it next played on April 14 during Week Three.

17. Ms. Shiver testified that it is the suggested policy of the NIFL corporate office that each team hold the players' first payroll check back as a security deposit on player equipment; however, it was an individual team decision whether to withhold paychecks.

18. Ms. Shiver is the individual owner of two teams in the NIFL, to wit:  the Louisiana Bayou Beasts, one of the three disputed teams; and the Lake Charles Landsharks.  Ms. Shiver testified that she held back the first payroll for both of her teams.  Therefore, she would not have submitted payroll to RPC for the Louisiana Bayou Beasts' first game (held on March 30, 2001) and the next game was scheduled for April 21, 2001, after RPC had cancelled the Service Agreement.

19. Ms. Shiver testified that the owner of the Mobile Seagulls called her and told her that the team was trying to submit its payroll for its April 6 game, but that RPC would not accept the information because the Service Agreement had been terminated.

20. Ms. Shiver testified that she was fully aware of the importance that each team player must complete a Form C-110. In fact, Ms. Shiver testified that the Form C-110 was the most important form which needed to be completed for workers' compensation coverage. If a player did not submit a C-110, he would not have workers' compensation coverage.

21. The Form C-110s were required to be filled out in a certain way. Ms. Shiver testified that when the NIFL received the forms from RPC, the forms were blank, except that RPC had included a Code number and employer name on the C-110s. Each player was to write and sign his name on the second page of the form.

22. Ms. Shiver testified that she did not recall if RPC directly sent the C-110s to each team. Each team completed two sets of the C-110s forms - one which was returned to the NIFL and the other to RPC. Additionally, the NIFL corporate office also sent the completed forms to RPC and to the Ohio Bureau of Workers' Compensation.

23. Ms. Shiver was never told that the completed C-110s for the three (3) disputed teams at issue were deficient.

24. Dan A'lio testified that he received the signed Service Agreement from the NIFL in March 2001. RPC also received a NIFL roster, which indicated there were 18 teams in the league. At that time, he thought all teams would utilize the services of RPC. He was disappointed to later learn that only 13 teams would be participating.

25. Mr. A'lio testified that only three teams submitted completed C-110 forms.

26. Mr. A'lio confirmed that payroll services would begin after the paperwork was completed and payroll was submitted by each team. RPC needed to know the names of the players prior to the first game.

27. Having reviewed the testimony at the bench trial, observed the demeanor of the witnesses, and considered the interests of the witnesses, the Court finds the testimony of Carolyn Shiver credible. Ms. Shiver testified clearly and unhesitatingly. She testified consistently about the lack of knowledge that the C-110s were apparently not correctly completed and about the policy of holding back the first week's paychecks. Nothing in the record contradicts this testimony.

28. For these reasons, the Court denies RPC's request to limit the damages of NIFL to only ten teams. The NIFL is entitled to damages for thirteen teams, which include the Louisiana Bayou Beasts, the Mobile Seagulls, and the Southern Oregon Heat.

So **ORDERED** this 31st day of August, 2007.

BY THE COURT:

s/Terrence F. McVerry, Judge
United States District Court

cc:	Forrest B. Fordham, III, Esquire
	Email: ffordhamlaw@aol.com

	Timothy C. Leventry, Esquire
	Leventry & Haschak
	Email: tleventry@lhrklaw.com

	Bernard C. Caputo, Esquire
	John A. Caputo & Associates
	Email: Bcaputolaw@aol.com

	Michael J. Seymour, Esquire
	Feczko & Seymour
	Email: mjseymour@covad.net